ORIGINAL

FILED
DISTRICT OF WYOMING
CASPER

2002 JUN 28   PM 2: 03

U.S. DISTRICT COURT

Mark W. Gifford
P.O. Box 2508
Casper, Wyoming 82602
(307) 265-3265
(307) 265-3266 (Fax)

Phillip D. Barber
1675 Larimer Street, Ste. 620
Denver, CO  80202
(303) 894-0880
(720) 904-5755 (fax)

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| SHELL ROCKY MOUNTAIN PRODUCTION, LLC, a Delaware limited liability corporation, )<br><br>Plaintiff, )<br><br>vs. )<br><br>ULTRA RESOURCES, INC., a Wyoming corporation, )<br><br>Defendant. ) | Civil No. 0 2 CV 1 0 3 9-B |

---

## COMPLAINT

---

COMES NOW Plaintiff, Shell Rocky Mountain Production, LLC, by and through its attorneys, Mark W. Gifford and Phillip D. Barber, and for its Complaint, makes the following allegations.

Receipt # 295599
Summons: ✓ issued
____ not issued

## PARTIES, JURISDICTION AND VENUE

1.    Plaintiff Shell Rocky Mountain Production, LLC (sometimes referred to as "Shell") is a Delaware limited liability corporation which maintains its principal place of business in Houston, Texas.

2.    Defendant Ultra Resources, Inc. ("Ultra") is a Wyoming corporation which maintains its principal place of business in Englewood, Colorado.

3.    Jurisdiction is based upon 28 U.S.C. § 1332 because of diversity of citizenship.    Jurisdiction also rests on 28 U.S.C. § 1331 because of the existence of claims involving the operation of oil and gas leases which cover lands that are owned by the United States of America, and which leases are subject to the laws and regulations of the United States.    The amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

4.    Venue is based upon 28 U.S.C. §1391(a) and (c).

## GENERAL ALLEGATIONS

5.    In the early 1990's, McMurry Oil Company ("MOC"), Nerd Enterprises, Inc., and Fort Collins Consolidated Royalties, Inc. acquired leasehold working interests in federal oil and gas leases on lands that are owned by the United States of America in Sublette County, Wyoming.  Generally, MOC and its partners owned a 25% working interest in all of the oil

2

and gas leases to all depths that comprised a large federal unit, known as the New Fork Unit Area.

6.    Wishing to explore and possibly develop the New Fork Unit Area, MOC entered into a Farmout Agreement on or about July 16, 1996 (the "1996 Farmout Agreement") with Meridian Oil, Inc. ("Meridian"), which gave MOC and its partners the right to earn the remaining 75% working interest in some of the lands and leases in the New Fork Unit, which Meridian then owned.  The 1996 Farmout Agreement between MOC and Meridian did not involve all of the lands in the New Fork Unit Area. The right of MOC and its partners to earn Meridian's 75% interest under the 1996 Farmout Agreement was limited to the lands described in Exhibit A thereto (which were referred to as the "Farmout Lands" in Section 1 of the Farmout Agreement), and to a particular "Contract Depth" which was also defined by the 1996 Farmout Agreement.  Meridian, and MOC and its partners retained their existing 75%/25% working interests in the other lands and other depths which were not covered by the 1996 Farmout Agreement.

7.    Defendant Ultra purchased Meridian's interests in the New Fork Unit Area, which included the lands that were burdened by the 1996 Farmout Agreement.

8.    In mid-2000, a dispute arose between MOC and its partners (or their successors) and Ultra about various aspects of the 1996 Farmout

Agreement. A lawsuit was filed in Sublette County, Wyoming (the "Lawsuit") to resolve those issues, which included: Would MOC (or its successors), or Ultra, be the Operator of the Farmout Lands and of other lands that were governed by the New Fork Unit Agreement? What interests had MOC and its partners (or their successors) acquired under the 1996 Farmout Agreement? And, how would costs and production revenues be shared with respect to the wells that had been drilled on lands that were earned under the 1996 Farmout Agreement, since the ownership interests of the parties changed at various depths? For instance, because MOC and its partners already owned a 25% interest to all depths in the lands covered by the 1996 Farmout Agreement, and because MOC and its partners had earned an additional 75% interest to the Contract Depth in each drilling block that was earned under the Farmout Agreement, the ownership of any well drilled under the 1996 Farmout Agreement changed, with MOC and its partners owning a greater interest (up to 100% before payout) in the so-called shallow depths, and only a 25% interest in the deeper depths. Conversely, Ultra owned a smaller interest in the shallow depths and a larger interest in the deeper zones of the Farmout Lands.

9.     The parties settled the Lawsuit by agreeing to dismiss with prejudice most of the parties' claims and counterclaims (the "Settled Claims"), and by agreeing to submit the remaining claims to binding arbi-

tration (the "Non-Settled Claims"). The parties' agreement was signed effective November 2, 2001, and is entitled Mutual Release and Settlement Agreement, a copy of which is attached hereto as Attachment "1" (the "Settlement Agreement"). The Settlement Agreement determined that MOC or its successor, which is Plaintiff Shell, would be the Operator of the Farmout Lands (which were first defined in the Settlement Agreement). It determined that Ultra or its successor, would be the Operator of the Non-Farmout Lands (as defined in the Settlement Agreement). It resolved how the costs and revenues on every well in the New Fork Unit Area would be allocated to all depths (whether the well was located on Farmout Lands or Non-Farmout Lands, as those terms were defined in the Settlement Agreement). The parties also agreed to and did terminate the New Fork Unit, with the approval of the Bureau of Land Management ("BLM").

10. The Farmout Lands were defined in the Settlement Agreement by reference to a legal description of their surface area, and the definition did not contain any depth limitations or restrictions. As noted, the Non-Farmout Lands were first defined in the Settlement Agreement (they were not defined in the 1996 Farmout Agreement), and were also described by reference to a legal description of their surface area without any depth limitations or restrictions. *See* Exhibits A and B to the Settlement Agreement, which is Attachment 1 hereto. Unlike the 1996 Farmout Agreement, the

Settlement Agreement defined the Farmout Lands by surface description, rather than by surface area and depth. The Settlement Agreement made Shell's predecessor, McMurry Energy Company ("MEC"), the Operator of any well that was located on the surface of the Farmout Lands (as defined in the Settlement Agreement) "to all depths". It made Ultra the Operator of any well located on the surface of the Non-Farmout Lands (as defined in the Settlement Agreement) "to all depths".

11.    The Settlement Agreement created two exceptions to Shell's and Ultra's right to serve as Operator of the Farmout Lands and Non-Farmout Lands (as defined therein), respectively. Those exceptions are found in paragraph 3.4 and involve situations which are not applicable to this dispute. Paragraph 3.4 of the Settlement Agreement states:

> 3.4    The parties acknowledge that restrictions imposed by the Bureau of Land Management or by other regulatory agencies may restrict and limit the number of surface drillsite locations for wells within the area that is presently known as the New Fork Unit Area, which could mean that one vertical and multiple directional wells may need to be drilled from a single drilling pad. *Such restrictions could have the result that a well with a surface location on the Farmout Lands may have to be drilled directionally* to a legally-permitted bottom-hole location on Non-Farmout Lands or *vice versa*. Thus, notwithstanding any provision herein to the contrary, MEC will be the Operator of all wells which are legally permitted to produce hydrocarbons from a bottom-hole location on Farmout Lands (*as defined herein*), except Block D which Ultra shall operate subject to Section 4.1, and ULTRA will be the Operator of all wells which are legally permitted to produce hydrocarbons from a bottom-hole location on Non-Farmout Lands (*as defined herein*) and on Block D as provided in the Block D JOA. Each

> operator shall be responsible for its operations on any drilling pad that is used by both operators, and shall indemnify and hold the other operator harmless from personal injury and property damage arising from its operations on such drilling pad. Each operator shall also provide insurance which is reasonably calculated to cover such personal injury or property damage. (emphasis added).

The first exception in paragraph 3.4 provided that Ultra would be the Operator of a portion of the Lands covered by the Settlement Agreement – known as Block D – pending the final outcome of the parties' arbitration. Block D is not at issue in this case. The second exception addressed a situation where restrictions might be imposed by the BLM or some other regulatory agency which could prohibit the location of a well on the surface of either the Farmout Lands or the Non-Farmout Lands, and where directional drilling would be needed to obtain a bottom-hole location under the lands where the well ordinarily would have been drilled. For example, if the BLM prohibited Ultra from drilling a vertical well from a surface location on the Non-Farmout Lands, Ultra could nonetheless serve as the Operator of a well which was located on the surface of the Farmout Lands if the well was drilled directionally to a bottom-hole location underlying the Non-Farmout Lands. An example of this situation is illustrated by Attachment "2" hereto. This exception does not apply to the controversy in this case because 1) no surface restriction has been imposed by the BLM, 2) the well in question is being drilled vertically, not directionally, and 3) the bottom-hole loca-

tion of the well in question is on the Farmout Lands as defined in the Settlement Agreement.

12.   Contemporaneous with the execution of the Settlement Agreement, the parties signed several Model Form Joint Operating Agreements ("JOAs"). A JOA is a standard industry document that contains a detailed description of the rights and obligations of the parties that have joint working interests in wells, and governs the drilling, completion and operation of oil and gas wells. The JOA for the lands in question (*i.e.,* the NE/4 of Section 14 of Block B of the Farmout Lands), is attached hereto as Attachment "3" and is consistent with the Settlement Agreement. Article V.A. of the JOA specifies that MEC (now Shell) "shall be the Operator of the Contract Area [which includes the NE/4 of Section 14], and shall conduct and direct and have full control over all operations on the Contract Area as permitted and required by, and within the limits of this agreement." Exhibit A to the JOA identifies the NE/4 of Section 14 as being within the "Contract Area" that is covered by the JOA, and it contains the following statement:

2.   <u>DEPTH RESTRICTIONS</u>.

This agreement covers all depths, however the interests of the parties as shown in Paragraph 3 below varies as to the depths shown.

Thus, consistent with the Settlement Agreement, MEC (now Shell) is the Operator "to all depths" of the Well.

13.   As noted herein, the Lawsuit arose in part because the parties could not agree on how to allocate well costs and production revenues where the ownership interests differed in the shallow and deep zones. Exhibit H to the JOA dealt with the allocation of costs and expenses in wells where the interests of the owners varied, depending upon the depth, and it is consistent with paragraph 3.2 of the Settlement Agreement which states:

> [t]he parties have agreed on a method that will allocate all costs of exploration, drilling, operation and production, as well as all production revenues, on all wells drilled on the Farmout Lands in a manner which is consistent with the ownership interests of the parties at the various depths underlying the Farmout Lands where said costs are incurred and such production obtained, said allocation being set forth in the JOAs that the parties have executed contemporaneously herewith.

14.   At the same time that the parties signed their Settlement Agreement and JOAs, they filed a Joint Motion for Dismissal of Claims in the Lawsuit, which was granted by the Sublette County District Court. The Court's Order dismissed all of the Settled Claims.

15.   At the same time that the parties signed the Settlement Agreement and the JOAs, they filed a Stipulated Motion for Stay Pending Arbitration in the Lawsuit (the "Stay"), which requested a complete stay of the Lawsuit until the Non-Settled Claims were resolved by the arbitration. The Sublette County District Court granted the Stay on December 6, 2001.

Since then, the parties have been actively involved in preparing the arbitration on the Non-Settled Claims, where a hearing has been set for September 16, 2002.

16.    The Lawsuit remained stayed, as agreed upon by the parties and as ordered by the court, until May 13, 2002, when Ultra filed a Motion to Enforce Settlement Agreement and Motion to Set Expedited Hearing.  Those filings violated the parties' Stay agreement.  Ultra's Motion to Enforce Settlement Agreement asked the Sublette County District Court to enjoin Shell from drilling and acting as Operator of the Riverside 2-14 Well (the "Well"). The Well is being drilled vertically and has a surface and bottom-hole location on the Farmout Lands, as defined in the Settlement Agreement.   Notwithstanding the Stay, the Sublette County District Court set a hearing on Ultra's Motion for May 21, 2002 in Jackson, Wyoming.  Shell had approximately three days to prepare its Response to Ultra's Motion to Enforce Settlement Agreement, in order to assure that it was timely filed in advance of the May 21 hearing.

17.    The Sublette County court held a hearing and issued its Order Concerning Motion to Enforce Settlement Agreement ("Order") at the close of business on May 21, 2002.  A copy of the trial court's Order is attached hereto as Attachment "4".  The court denied Ultra's Motion to Enforce Settlement Agreement.

18.    A controversy continues to exist between Ultra and Shell about whether Shell is entitled to be the Operator of the Well, and of all other wells which have a surface and bottom-hole location underlying the Farmout Lands, as those lands are defined in Exhibit A to the Settlement Agreement.  Specifically, it is Ultra's position that Shell can drill and operate the Well down to 9,931 feet, rather than "to all depths".  It is also Ultra's position that Ultra is entitled to operate the Well if it is drilled below 9,931 feet.  Thus, under Ultra's position, Ultra could prevent Shell from operating any well simply by proposing that the well be deepened to one foot below the depth that was earned under the 1996 Farmout Agreement.

**FIRST CLAIM FOR RELIEF**
**(Declaration that Shell is the Operator of Any Well with A Surface**
**and Bottom-Hole Location on the Farmout Lands to All Depths)**

19.    Shell realleges and incorporates by this reference the allegations of 1 through 18 of this Complaint.

20.    A dispute and controversy exists between Shell and Ultra about whether Shell is entitled to be the Operator of the Well to all depths, and of other wells to all depths which are drilled vertically and have surface and bottom-hole locations on the Farmout Lands, as defined in Exhibit A to the Settlement Agreement.

21.    Pursuant to F.R.C.P. 57, Shell is entitled to a declaratory judgment that the Settlement Agreement and Joint Operating Agreements

make Shell (as MEC's successor) the Operator of the Well to all depths, and of all other wells to all depths, which have a surface location and a bottom-hole location on the Farmout Lands, as those lands are defined in Exhibit A to the Settlement Agreement.

WHEREFORE, pursuant to F.R.C.P. 57, Shell is entitled to a declaratory judgment that the Settlement Agreement and Joint Operating Agreement make Shell (as MEC's successor) the Operator of the Well to all depths, and of all other wells to all depths, which have a surface location and a bottom-hole location on the Farmout Lands, as those lands are defined in Exhibit A to the Settlement Agreement.

DATED this 28th day of June, 2002.

SHELL ROCKY MOUNTAIN
PRODUCTION, LLC, a Delaware
limited liability corporation,
Plaintiff


By _Mark W. Gifford_____
MARK W. GIFFORD
243 South Park Street
P.O. Box 2508
Casper, Wyoming  82602
(307) 265-3265
(307) 265-3266 (fax)
and
PHILLIP D. BARBER
1675 Larimer Street, Ste. 620
Denver, CO  80202
(303) 894-0880
(720) 904-5755 (fax)

## MUTUAL RELEASE AND SETTLEMENT AGREEMENT

THIS MUTUAL RELEASE AND SETTLEMENT AGREEMENT is made and entered into effective this _2ND_ day of _November_, 2001 and shall be effective as set forth in Section 13.1 herein (the "Effective Date"), by and among:

    1.    PLAINTIFFS, as used herein shall refer to McMURRY ENERGY COMPANY, McMURRY OIL COMPANY, NERD ENERGY, INC., and FORT COLLINS CONSOLIDATED ROYALTIES, INC.; and

    2.    DEFENDANTS, as used herein shall refer collectively to ULTRA RESOURCES, INC. ("ULTRA") and LANCE OIL & GAS COMPANY, INC. ("LANCE").

### RECITALS:

    A.    WHEREAS, PLAINTIFFS and DEFENDANTS have prosecuted Sublette Civil Action No. 6173 in the District Court for the Ninth Judicial District, State of Wyoming (the "Litigation"); and

    B.    WHEREAS, PLAINTIFFS allege causes of action against DEFENDANTS; and

    C.    WHEREAS, DEFENDANTS have asserted counterclaims or defenses against PLAINTIFFS; and

    D.    WHEREAS, PLAINTIFFS and DEFENDANTS are desirous of completely and fully and finally settling certain of the claims and defenses which each has asserted in Civil No. 6173 in said Court as described in Sections 2 and 3 herein (the "Settled Claims"), and wish to provide for the full, final and complete and mutual release of each other with respect to the

**ATTACHMENT**
1

Settled Claims, and for the arbitration of the "Non-Settled Claims" as described in Section 4 herein.

**NOW, THEREFORE, THE PARTIES AGREE HERETO AS FOLLOWS**:

**1.0.   RECITALS**:

The above RECITALS are contractual and are incorporated herein in their entirety.

**2.0   RELEASE AND DISCHARGE**:

2.1   **FOR AND IN CONSIDERATION** of the agreements between PLAINTIFFS and DEFENDANTS set forth in Section 3 herein, PLAINTIFFS and DEFENDANTS do hereby completely release, acquit, and forever release and discharge one another, their successors, and assigns of and from any and all past, present or future actions, claims, demands, obligations, causes of action, damages, costs, loss of services or income, expenses, and compensation of any kind or nature whatsoever be they contractual, physical or otherwise, resulting or arising, or which may in the future result or arise from the Settled Claims.

2.2   This release includes, all existing, future, known and unknown claims, demands, and causes of action and defenses, known or unknown, pending or threatened, for all existing, future, known, and unknown damages and remedies that have been brought or could have been brought by PLAINTIFFS related to PLAINTIFFS' First, Third and Fourth Claims for Relief brought in the Litigation ("PLAINTIFFS' Settled Claims"), and by DEFENDANTS related to DEFENDANTS' Fourth, Sixth, Seventh, Eighth, Ninth, Tenth and Eleventh Claims for Relief brought in the Litigation (collectively "DEFENDANTS' Settled Claims"). PLAINTIFFS' Settled Claims and DEFENDANTS' Settled Claims include, but are not limited to, all claims,

defenses, demands, lawsuits, debts, accounts, actions, cross-actions, liabilities, obligations, losses, costs, expenses, remedies, and causes of action of any nature, whether sounding in contract or in tort, or based on fraud, negligence or misrepresentation, breach of duty or common law, or arising under or by virtue of any judicial decision, statute or regulation, for past, present, future, known, and unknown injuries, property or economic damage and all other losses and damages of any kind insofar and only insofar as they arise out of the transactions that were the basis for PLAINTIFFS' Settled Claims and DEFENDANTS' Settled Claims, including but not limited to the following:  all actual damages; all exemplary and punitive damages; all penalties of any kind, including without limitation any tax liabilities or penalties; damage to business reputation; lost profits or goodwill; consequential damages; damages ensuing from loss of credit; and, prejudgment and post-judgment interest, costs and attorney's fees.

2.3    This release and discharge of PLAINTIFFS' Settled Claims and DEFENDANTS' Settled Claims shall also apply to PLAINTIFFS' and DEFENDANTS' attorneys, agents, servants, representatives, employees, parents, subsidiaries, shareholders, affiliates, partners, predecessors and successors in interest, assigns, and all other persons, firms, corporations or other entities with whom any of the parties hereto have been, are now, or may hereafter be affiliated.

2.4    This release and discharge on the part of the PLAINTIFFS and DEFENDANTS shall be a fully binding and complete release and discharge which achieves full, final, and total settlement of PLAINTIFFS' Settled Claims and DEFENDANTS' Settled Claims, among the

parties, and their assigns and successors, but this release and discharge shall not affect or compromise those Non-Settled Claims described in Section 4, herein.

2.5     The PLAINTIFFS and DEFENDANTS represent and acknowledge that they have been represented by legal counsel prior to and at the time of signing this MUTUAL RELEASE AND SETTLEMENT AGREEMENT.

**3.0     SETTLED CLAIMS**:

3.1     The Settled Claims include PLAINTIFFS' Settled Claims and DEFENDANTS' Settled Claims, as well as those claims described in Sections 3.2 through 3.7 herein.

3.2     PLAINTIFFS and DEFENDANTS have also settled all claims and disputes relating to who shall serve as Operator of the Farmout Lands and the Non-Farmout Lands, which lands are described in and are subject to that certain Farmout Agreement dated July 16, 1996, as amended, by and between McMurry Oil Company and Meridian Oil, Inc. ("Farmout Agreement"). The surface acreages of the Farmout Lands and the Non-Farmout Lands  are described in Exhibits "A" and "B" hereto, respectively. The Farmout Lands are subject to depth restrictions as set forth in the Farmout Agreement and in the Joint Operating Agreements ("JOAs") executed contemporaneously herewith. Except as provided in Sections 3.4 and 4.1 herein, the parties agree that McMurry Energy Company ("MEC") shall be the Operator of all wells drilled on a surface location on the Farmout Lands to all depths, under the Joint Operating Agreements ("JOAs") that have been concurrently signed by the parties hereto. PLAINTIFFS' First, Third and Fourth Claims for Relief in the Litigation shall be dismissed with prejudice. The parties acknowledge that the ownership interests underlying the Farmout Lands may vary

depending upon the depth to which a particular well is drilled on the Farmout Lands, and the

parties have agreed on a method that will allocate all costs of exploration, drilling, operation and

production, as well as all production revenues, on all wells drilled on the Farmout Lands in a

manner which is consistent with the ownership interests of the parties at the various depths

underlying the Farmout Lands where said costs are incurred and such production obtained, said

allocation being set forth in the JOAs that the parties have executed contemporaneously

herewith.

      3.3     Except as provided in Sections 3.4 and 4.1 herein, the parties agree that ULTRA

shall serve as Operator of all wells drilled on a surface location on the Non-Farmout Lands to all

depths, under the JOA that has been concurrently signed by the parties.  ULTRA'S Fourth,

Sixth, Seventh, Eighth, Ninth, Tenth and Eleventh Claims for Relief in the Litigation shall be

dismissed with prejudice.

      3.4     The parties acknowledge that restrictions imposed by the Bureau of Land

Management or by other regulatory agencies may restrict and limit the number of surface

drillsite locations for wells within the area that is presently known as the New Fork Unit Area,

which could mean that one vertical and multiple directional wells may need to be drilled from a

single drilling pad.  Such restrictions could have the result that a well with a surface location on

the Farmout Lands may have to be drilled directionally to a legally-permitted bottom-hole

location on Non-Farmout Lands or *vice versa*.  Thus, notwithstanding any provision herein to the

contrary, MEC will be the Operator of all wells which are legally permitted to produce

hydrocarbons from a bottom-hole location on Farmout Lands (as defined herein), except

Block D which Ultra shall operate subject to Section 4.1, and ULTRA will be the Operator of all wells which are legally permitted to produce hydrocarbons from a bottom-hole location on Non-Farmout Lands (as defined herein) and on Block D as provided in the Block D JOA. Each operator shall be responsible for its operations on any drilling pad that is used by both operators, and shall indemnify and hold the other operator harmless from personal injury and property damage arising from its operations on such drilling pad. Each operator shall also provide insurance which is reasonably calculated to cover such personal injury or property damage.

3.5    PLAINTIFFS and DEFENDANTS agree to terminate the Unit Agreement for the Development and Operation of the New Fork Unit Area, County of Sublette, State of Wyoming, dated November 25, 1980 by and between El Paso Natural Gas Company, Unit Operator, and others (the "Unit Agreement"), and PLAINTIFFS and DEFENDANTS have concurrently herewith executed a Request for Termination of the Unit Agreement. Said termination shall be in accordance with Article 20 of the Unit Agreement, or as otherwise agreed by PLAINTIFFS and DEFENDANTS, and the parties hereto agree to seek immediate approval from the appropriate Supervisor of the Bureau of Land Management for such Request for Termination. The parties also agree to provide notice of such Request for Termination, as may be required, to all appropriate parties to the said Unit Agreement, or their heirs, successors and assigns. The parties further agree to take all steps, and execute all documents and make such agreements as are necessary and reasonable to terminate the Unit Agreement and to continue operations on the lands that were subject to that agreement. Those steps shall include, but shall not be limited to, termination of the Unit Operating Agreement for the New Fork Unit Area, County of Sublette,

State of Wyoming, dated January 16, 1981, by and between El Paso Natural Gas Company, Unit Operator, and others.

3.6     Concurrently with the execution of this MUTUAL RELEASE AND SETTLEMENT AGREEMENT, LANCE shall assign to PLAINTIFFS (if it has not already done so) the interests earned by PLAINTIFFS under the Farmout Agreement in Blocks A, B and E of the Farmout Lands from surface down to the stratigraphic equivalent of 200 feet below total depth in the Earning Well drilled on each such block, and the interest earned by PLAINTIFFS under the Farmout Agreement in Block C of the Farmout Lands from the surface down to the stratigraphic equivalent of 200 feet below a depth of 10,000 feet as encountered in the Pinedale 13-19 Well.  PLAINTIFFS' right to earn LANCE'S interest in said Block C below said depth shall be a Non-Settled Claim and shall be resolved in the manner described in Section 4 below. Upon receipt of the said Assignments, any funds owed to LANCE with respect to the applicable drilling blocks and wells shall be released and paid contemporaneously with delivery to PLAINTIFFS of LANCE'S assignments.

3.7     PLAINTIFFS and DEFENDANTS further agree that the Settled Claims shall include any and all claims or causes of action which may be based upon any fact, act, or conduct that are part of the Settled Claims and that exist as of the Effective Date of this MUTUAL RELEASE AND SETTLEMENT AGREEMENT, and that the releases in Section 2 herein shall apply to all of the Settled Claims.  The provisions of Section 2 shall not apply, however, to the Non-Settled Claims described in Section 4 herein.

## 4.0   NON -SETTLED CLAIMS AND ARBITRATION:

4.1     The parties specifically except from the provisions of Sections 2 and 3 herein

PLAINTIFFS' Second and Fifth Claims for Relief in the Litigation, and ULTRA'S First,

Second, and Third  Claims for Relief in the Litigation, and PLAINTIFFS' and DEFENDANTS'

asserted defenses to such claims, which claims and asserted defenses shall be submitted to

binding arbitration pursuant to Section 4.3  herein and which are referred to herein as the

Non-Settled Claims; it being PLAINTIFFS' and DEFENDANTS' intent that they have preserved

and shall arbitrate whether DEFENDANTS properly terminated the Farmout Agreement and

whether PLAINTIFFS or their predecessors have earned Block D (defined in Exhibit A hereto)

under the terms of the Farmout Agreement.  The issues to be presented in the arbitration will be

limited to:

    i.    Whether the transfer from MOC to MEC of rights in the Farmout Agreement violated the Farmout Agreement and allowed DEFENDANTS to terminate the Farmout Agreement.

    ii.    Whether PLAINTIFFS' drilling of the 13-32 Well below 10,000 feet violated the Farmout Agreement and allowed DEFENDANTS to terminate the Farmout Agreement.

    iii.    Whether drilling the 13-32 Well at its location, rather than at the 7-32 location, meant that the Block D Earning Well was not timely drilled.

    iv.    Whether PLAINTIFFS have earned rights in Block D under the Farmout Agreement by drilling the 13-32 Well, and the depth to which PLAINTIFFS have earned those rights, but in no event deeper than the stratigraphic equivalent of 200 feet below 10,000 feet in the 13-32 Well.

Until the arbitration panel has rendered its decision regarding Block D, Ultra shall serve as the Operator of the Block D lands under the JOA that has been concurrently signed by the parties for Block D. However, the existing 13-32 Well shall be operated by MEC subject to the terms of the Block D JOA. If the arbitration panel determines that PLAINTIFFS have earned Block D, MEC shall assume the role of Operator as provided in the Block D JOA. The costs of drilling, completing and operating any well drilled prior to the decision of the arbitration panel shall be paid in accordance with the terms of the Block D JOA and the letter agreement executed by the parties contemporaneously with the execution of the Block D JOA. If the arbitration panel determines PLAINTIFFS have the right to earn Block D, and the 13-32 Well is not an Earning Well as defined in the Farmout Agreement, then PLAINTIFFS shall have seven (7) months following the arbitration decision to drill an Alternate Earning Well under Section 8 of the Farmout Agreement.

    4.2    PLAINTIFFS and LANCE shall also submit to arbitration whether PLAINTIFFS have earned LANCE'S interest covered by the Farmout Agreement in Block C of the Farmout Lands below the depth that has been assigned by LANCE.

    4.3    The parties agree to submit the Non-Settled Claims to binding arbitration under the following terms and conditions: Within 15 days after the Effective Date of this MUTUAL RELEASE AND SETTLEMENT AGREEMENT, PLAINTIFFS on the one hand, and DEFENDANTS on the other hand, shall each designate an arbitrator of their choosing. The two arbitrators designated by PLAINTIFFS and DEFENDANTS shall then choose a third arbitrator who shall be a "neutral" arbitrator with appropriate experience in the oil and gas industry on the

matters raised in the Non-Settled Claims. Said third arbitrator shall not have any present or past

affiliations with any of the parties to this case, including, without limitation, any past or present

ownership interest in any party and/or any past or present professional or employment

relationship with any party. Each party shall pay its designated arbitrator and witnesses, and

PLAINTIFFS shall pay one half and DEFENDANTS shall pay one half of the remaining costs of

the arbitration. The parties agree that the three arbitrators shall generally conduct the arbitration

in accordance with the Rules of the American Arbitration Association, and that an informal

conference shall be held among the parties, and the arbitration panel as soon as possible to

discuss procedures, and to establish discovery and hearing schedules which shall be in

accordance with the Wyoming Rules of Civil Procedure and which shall reasonably

accommodate the needs of the parties and the arbitration panel; provided, however, that the

arbitration panel and the parties shall use their best efforts to complete the arbitration of the Non-

Settled Claims by February 15, 2002, with a decision by the majority of the panel to be binding

and rendered within 30 days after the completion of any arbitration hearing. The parties further

agree that the motions for summary judgment which are presently pending in Civil No. 6173,

which relate to the Non-Settled Claims, will be transferred to the arbitration panel for decision,

and that said panel shall have the authority to grant or deny any or all of said motions, to require

further argument on said motions, or to reserve ruling on said motions until the completion of

any hearing in the arbitration proceeding. The parties further agree that Defendants may file a

response to the arguments and materials found in Plaintiffs' Supplement to Pending Summary

Judgment Motions.

4.4    Except for the right of any party to the arbitration proceeding to seek an order from a court of competent jurisdiction to enforce the arbitrators' decision, the parties to this MUTUAL RELEASE AND SETTLEMENT AGREEMENT hereby waive any and all rights which they may now have or may have in the future to appeal the ruling of the said arbitration panel; the intent of the parties being that the decision of the arbitration panel shall fully and finally resolve all of the Non-Settled Claims.

4.5    Notwithstanding anything herein to the contrary, PLAINTIFFS and DEFENDANTS do not release any claim which any party may have against the other that relates to the payment of a party's share of production proceeds from any well located on the Farmout Lands and the Non-Farmout Lands, or to any claims for unpaid costs and expenses associated with the drilling and operation of, and the production from, any well that is located on the Farmout Lands and/or the Non-Farmout Lands.  Further, notwithstanding anything herein to the contrary, the individual Plaintiffs do not release, discharge or settle any claims which they may have between themselves or against any other Plaintiff.

4.6    The parties further agree that they shall seek dismissal with prejudice of all Settled Claims from the Court in Civil No. 6173, and a stay of all proceedings for the Non-Settled Claims in Civil No. 6173 pending the outcome of the arbitration.

## 5.0    **FINALITY OF JUDGMENTS**:

5.1    The Court's orders in this case shall become final orders when they are entered.

5.2    The parties hereby waive any right to appeal any of the said orders entered by the Court in this case.

5.3     By signing this MUTUAL RELEASE AND SETTLEMENT AGREEMENT, including, but not limited to, the releases and agreements hereunder, the parties shall not be considered to have made any admission of liability or fault, such liability or fault being expressly denied by the parties hereto.

**6.0     ACKNOWLEDGMENT OF FAIRNESS:**

6.1     PLAINTIFFS and DEFENDANTS state and represent that the other parties and their attorneys, along with all of their principals, agents, and representatives have dealt with them fairly and in good faith in all respects with regard to this MUTUAL RELEASE AND SETTLEMENT AGREEMENT and all other matters relating thereto with respect to the consideration, negotiation, adjustment, and settlement of the claims.

6.2     PLAINTIFFS and DEFENDANTS expressly represent and agree that no promises, considerations or representations of any kind have been made by any other party or its representatives or agents, other than as expressed in this MUTUAL RELEASE AND SETTLEMENT AGREEMENT, and that PLAINTIFFS and DEFENDANTS have not relied upon the statements or actions of any other party or other person in executing this MUTUAL RELEASE AND SETTLEMENT AGREEMENT.

**7.0     ADDITIONAL DOCUMENTS AND COOPERATION:**

7.1     Each party hereto agrees to fully cooperate and execute any and all supplemental documents and to make and take all additional actions that may be necessary or appropriate to give full force and effect to the terms and intent of this MUTUAL RELEASE AND SETTLEMENT AGREEMENT.  The parties, acting through their respective attorneys, agree to

file such documents in Civil Action No. 6173 in the Ninth Judicial District Court, Sublette County, Wyoming which may be necessary or appropriate to give full force and effect to the terms and intent of this MUTUAL RELEASE AND SETTLEMENT AGREEMENT.

**8.0    REPRESENTATION OF COMPREHENSION OF DOCUMENT:**

8.1    PLAINTIFFS and DEFENDANTS acknowledge and agree that they have completely read this MUTUAL RELEASE AND SETTLEMENT AGREEMENT and that they understand each provision contained herein, and freely and voluntarily sign the same.

**9.0    ENTIRETY OF AGREEMENT:**

9.1    This MUTUAL RELEASE AND SETTLEMENT AGREEMENT contains the entire agreement between PLAINTIFFS and DEFENDANTS relating to the matters described herein, and the terms herein are contractual and not mere recitals, and they shall be binding upon and inure to the benefit of the successors and assigns of each party hereto.

**10.0   ATTORNEYS' FEES AND COSTS:**

10.1    PLAINTIFFS and DEFENDANTS agree to bear their own attorney fees and costs arising from the actions of their own counsel, agents and representatives in connection with the arbitration described herein and Civil No. 6173 and with this MUTUAL RELEASE AND SETTLEMENT AGREEMENT, the matters and documents referred to herein, and all related matters.

**11.0   GOVERNING LAW:**

11.1    This MUTUAL RELEASE AND SETTLEMENT AGREEMENT shall be construed and interpreted in accordance with the laws of the State of Wyoming.

## 12.0    COUNTERPART EXECUTION:

12.1    This MUTUAL RELEASE AND SETTLEMENT AGREEMENT may be executed in separate counterparts and shall be effective only after it and the JOAs and assignment described herein have been fully executed by all parties hereto, and shall be deemed fully executed when all parties have executed a copy hereof.  Ultimately, a copy bearing original signatures will be delivered to the parties; however, the agreement shall be fully binding immediately on execution and delivery of a facsimile signature which shall be sufficient for all purposes hereunder.

## 13.0    EFFECTIVE DATE:

13.1    Notwithstanding anything herein to the contrary, this MUTUAL RELEASE AND SETTLEMENT AGREEMENT, and the terms, conditions, covenants, promises, releases, and settlements contained herein, shall become effective only on the day on which the Bureau of Land Management grants and approves the Request for Termination of the Unit Agreement, described in Section 3.5 herein. If the Unit Agreement is not so terminated, or if the Bureau of Land Management has not issued a letter approving or denying the said request for Termination of Unit Agreement by February 1, 2002 (*i.e.* no action has been taken), then this MUTUAL RELEASE AND SETTLEMENT AGREEMENT shall be null and void, and the status of the parties shall be as if this MUTUAL RELEASE AND SETTLEMENT AGREEMENT never existed.  The JOAs described herein shall also become effective only on the Effective Date of this MUTUAL RELEASE AND SETTLEMENT AGREEMENT.

DATED this ___2ᴺᴰ___ day of ___Nᴏᴠᴇᴍʙᴇʳ___, 2001.

PLAINTIFFS

McMURRY ENERGY COMPANY

BY: _____

TITLE: _____

Attest:

_____
Secretary

**McMURRY OIL COMPANY**

BY: _____

TITLE: _____

Attest:

_____
Secretary

**NERD ENERGY, INC.**

BY: _Neil A. McMurry_

TITLE: _PRESIDENT_

Attest:

_Neil A. McMurry_
Secretary

**FT. COLLINS CONSOLIDATED
ROYALTIES, INC.**

BY: _____

TITLE: _____

Attest:

_____
Secretary

McMURRY OIL COMPANY

BY: _____

TITLE: UP _____

Attest:

_Mary A. Vivano_
Secretary

NERD ENERGY, INC.

BY: _____

TITLE: _____

Attest:

_____
Secretary

FT. COLLINS CONSOLIDATED
ROYALTIES, INC.

BY: _____

TITLE UP _____

Attest:

_Mary A. Vivano_
Secretary

11/02/01  FRI 11:34 FAX 2818762831          ULTRA PETROLEUM Corp                    ☑017

Nov 01 01 06:09p        phillip barber              3039940885              p.16

**DEFENDANTS**

**ULTRA RESOURCES, INC.**

BY: _____

TITLE: _PRESIDENT_

Attest:

_____
Secretary

**LANCE OIL & GAS COMPANY, INC.**

BY: _____

TITLE: _____

Attest:

_____
Secretary

DEFENDANTS

ULTRA RESOURCES, INC.

BY: _____

TITLE: _____

Attest:

_____

Secretary

LANCE OIL & GAS COMPANY, INC.

BY: _____

TITLE: Vice President

J. BURTON JONES
V.P. Business Development & Land

Attest:

_____

Secretary

STATE OF _Colorado_      )
                               ) ss.

COUNTY OF _Denver._      )

The foregoing MUTUAL RELEASE AND SETTLEMENT AGREEMENT was sworn to, subscribed, and acknowledged before me by _John Martin_, President of McMURRY ENERGY COMPANY this _2nd_ day of _November_, 2001.

_[Notary Seal: PUBLIC, STATE OF COLORADO]_

My Commission Expires 11/30/2002

                                       Notary Public

My Commission Expires:


STATE OF _____ )
                               ) ss.

COUNTY OF _____ )


The foregoing MUTUAL RELEASE AND SETTLEMENT AGREEMENT was sworn to, subscribed, and acknowledged before me by _____, President of McMURRY OIL COMPANY this _____ day of _____, 2001.


                                         Notary Public

My Commission Expires:

STATE OF _____     )
                                   ) ss.
COUNTY OF _____     )


The foregoing MUTUAL RELEASE AND SETTLEMENT AGREEMENT was sworn to, subscribed, and acknowledged before me by _____, President of McMURRY ENERGY COMPANY this _____ day of _____, 2001.


_____
Notary Public


My Commission Expires:


STATE OF _Colorado_____     )
                           ) ss.
COUNTY OF _Denver_____     )


The foregoing MUTUAL RELEASE AND SETTLEMENT AGREEMENT was sworn to, subscribed, and acknowledged before me by _Jonathan Grannis_ Vice-President of McMURRY OIL COMPANY this _30th_ day of _October_____, 2001.


_Judith B. Sisneros_
Notary Public


My Commission Expires: _3-17-04_

```
JUDITH B. SISNEROS
NOTARY PUBLIC
STATE OF COLORADO
```
My Commission Expires Mar. 17, 2004

STATE OF _Colorado_ )
                        ) ss.
COUNTY OF _Denver_ )

       The foregoing MUTUAL RELEASE AND SETTLEMENT AGREEMENT was sworn to, subscribed, and acknowledged before me by _Neil A McMurry_, _President_ of NERD ENERGY, INC. this _30th_ day of _October_, 2001.

_[Notary stamp]_

_[signature]_
Notary Public

My Commission Expires:


STATE OF _____ )
                        ) ss.
COUNTY OF _____ )

       The foregoing MUTUAL RELEASE AND SETTLEMENT AGREEMENT was sworn to, subscribed, and acknowledged before me by _____, _____ of FT. COLLINS CONSOLIDATED ROYALTIES, INC.  this _____ day of _____, 2001.


_____
Notary Public

My Commission Expires:

STATE OF _____ )
                                                    ) ss.
COUNTY OF _____ )


    The foregoing MUTUAL RELEASE AND SETTLEMENT AGREEMENT was sworn
to, subscribed, and acknowledged before me by _____,
_____ of NERD ENERGY, INC. this _____ day of _____,
2001.


                                                    _____
                                                    Notary Public

My Commission Expires:



STATE OF _Colorado_____ )
                                                    ) ss.
COUNTY OF _Denver_____ )

    The foregoing MUTUAL RELEASE AND SETTLEMENT AGREEMENT was sworn
to, subscribed, and acknowledged before me by _Jonathan Grannis_,
_Vice-President_ of FT. COLLINS CONSOLIDATED ROYALTIES, INC. this _30th_
day of _October_____, 2001.


                                                    _Judith B. Sisneros_____
                                                    Notary Public

                                        ┌─────────────────────────────┐
                                        │   JUDITH B. SISNEROS        │
My Commission Expires: _3-17-04_        │     NOTARY PUBLIC           │
                                        │   STATE OF COLORADO         │
                                        └─────────────────────────────┘
                                        My Commission Expires Mar. 17, 2004

STATE OF <u>Texas</u>            )
                                 ) ss.
COUNTY OF <u>Harris</u>          )

    The foregoing MUTUAL RELEASE AND SETTLEMENT AGREEMENT was sworn to, subscribed, and acknowledged before me by <u>Michael D Watford</u> <u>President</u> of ULTRA RESOURCES, INC. this 2nd day of <u>November</u>, 2001.

DENA RENAE DuBOSE
Notary Public, State of Texas
My Commission Expires 12-07-04

_Dena Renae DuBose_
Notary Public

My Commission Expires: 12-07-04


STATE OF _____ )
                          ) ss.
COUNTY OF _____ )

    The foregoing MUTUAL RELEASE AND SETTLEMENT AGREEMENT was sworn to, subscribed, and acknowledged before me by _____, _____ of LANCE OIL & GAS COMPANY, INC. this _____ day of _____, 2001.


                            _____
                            Notary Public

My Commission Expires:

NOV. 3. 2001 11:24AM 11 24 AM WESTERN_GAS_LEGAL  HOGLUM DAVENPORT      NO. 1682  P. 4

FAX NO. 303 571 1600      P. 21

STATE OF _____ )
                               ) ss.
COUNTY OF _____ )

The foregoing MUTUAL RELEASE AND SETTLEMENT AGREEMENT was sworn to, subscribed, and acknowledged before me by _____ _____ of ULTRA RESOURCES, INC. this _____ day of _____, 2001.

_____
Notary Public

My Commission Expires:

STATE OF ___COLORADO___ )
                               ) ss.
COUNTY OF __ADAMS__ )

The foregoing MUTUAL RELEASE AND SETTLEMENT AGREEMENT was sworn to, subscribed, and acknowledged before me by ___J. Burton Jones___, Vice President- Business Development and Land of LANCE OIL & GAS COMPANY, INC. this 2nd day of November _____, 2001.

_Rosalyne I. Condos_
Notary Public —Rosalyne I. Condos

My Commission Expires: 09-16-2004.

APPROVED AS TO FORM:

PHILLIP D. BARBER, P.C.

By: _____
     Phillip D. Barber
1700 Broadway, Suite 1800
Denver, Colorado 80290
Telephone:　(303) 894-0880

Mark W. Gifford
243 South Park Street
P.O. Box 2508
Casper, WY  82602
Telephone:   307-265-3265

Attorneys for the Plaintiffs

McGLOIN, DAVENPORT, SEVERSON &
SNOW, P.C.

By: _____
     Gary C. Davenport
1600 Stout Street, Ste. 1600
Denver, CO  80202-3103
Telephone:   303-863-9800

MULLIKIN, LARSON & SWIFT LLC
R. Michael Mullikin, Esq.
P.O. Box 4099
Jackson, WY  83001
Telephone:   307-733-3923

Attorneys for Defendant Lance Oil & Gas
Company, Inc.

FARNSWORTH & VONBERG, LLP

By: _____
     T. Brooke Farnsworth
     Bennett S. Bartlett
333 No. Sam Houston Pkwy., Ste. 300
Houston, TX  77060
Telephone:   281-931-8902

RANCK, SCHWARTZ & DAY
Timothy C. Day
20 East Simpson
P.O. Box 3890
Jackson, WY  83001-3890
Telephone:   307-733-5130

John R. Vincent
301 East Adams
P.O. Box 433
Riverton, WY  82501
Telephone:   307-857-6005

Attorneys for Defendant Ultra Resources,
Inc.

**New Fork Unit**
**Farmout Lands**

**Block A**
<u>Township 32 North, Range 109 West, 6th P.M.</u>
Section 34: SW/4
Section 35: SW/4

<u>Township 31 North, Range 109 West, 6th P.M.</u>
Section 2: SW/4
Section 3: Lots 1, 2, S/2 NE/4, SW/4

**Block B**
<u>Township 31 North, Range 109 West, 6th P.M.</u>
Section 13: NE/4, SW/4
Section 14: NE/4
Section 23: NE/4
Section 24: NE/4

**Block C**
<u>Township 31 North, Range 109 West, 6th P.M.</u>
Section 24: SW/4
Section 25: NE/4, SW/4

<u>Township 31 North, Range 108 West, 6th P.M.</u>
Section 19: Lots 3, 4, E/2 SW/4,
Section 30: Lots 3, 4, E/2 SW/4

**Block D (NOTE: THIS IS THE CONTESTED 13-32 FARMOUT BLOCK)**
<u>Township 31 North, Range 108 West, 6th P.M.</u>
Section 31: NE/4
Section 32: NE/4, SW/4

<u>Township 30 North, Range 108 West, 6th P.M.</u>
Section 5: Lots 1, 2, S/2 NE/4
Section 6: Lots 1, 2, S/2 NE/4

**Block E**
<u>Township 30 North, Range 108 West, 6th P.M.</u>
Section 4: SW/4
Section 9: NE/4, SW/4
Section 10: SW/4
Section 14: SW/4



EXHIBIT

_A_

## New Fork Unit
## Non-Farmout Lands

__Township 32 North, Range 109 West, 6th P.M.__
Section 27: S/2
Section 28: SE
Section 33: E/2
Section 34: N/2, SE

__Township 31 North, Range 109 West, 6th P.M.__
Section  2: Lots 3, 4, S/2NW, SE
Section  3: Lots 3, 4, S/2NW, SE
Section 10: NE, NESE
Section 11: Lot 1, N/2NW, together with all the bed of
            the New Fork River between the mean high
            water mark and medial lines thereof in front
            of and appurtenant to Lot 1 of said Section 11.
Section 12: Lots 8, 9, 10, SESW, together with all the
            bed of the
            New Fork River between the mean high water
            mark and medial lines thereof in front of and
            appurtenant to Lots 8, 9 and 10 of said Section
            12.
Section 13: NW, SE
Section 14: SW, S/2NW, SE
Section 23: SE
Section 24: NW, SE
Section 25: NW, SE

__Township 31 North, Range 108 West, 6th P.M.__
Section 29: W/2, SE
Section 30: Lots 1, 2, E/2NW, E/2
Section 31: Lots 1, 2, 3, 4, E/2W/2, SE
Section 32: NW, SE
Section 33: SW

__Township 30 North, Range 108 West, 6th P.M.__
Section  4: Lots 3, 4, S/2NW, SE
Section  5: Lots 3, 4, S/2NW, S/2
Section  8: N/2
Section  9: NW, SE
Section 10: NW, SE
Section 11: SW
Section 14: NW
Section 15: All

**EXHIBIT**

_B_





A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT
### (ST Farmout Lands-Parts Blocks A and B)

OPERATING AGREEMENT

DATED

October 25,     2001     ,

OPERATOR   __MCMURRY ENERGY COMPANY__

CONTRACT AREA   __Township 31 North, Range 109 West, 6th P.M.__

__Section  2: SW/4__

__Section  3: Lots 1, 2, S/2NE, SW/4__

__Section 13: NE/4, SW/4__

__Section 14: NE/4__

COUNTY OR PARISH OF   Sublette                STATE OF     Wyoming

COPYRIGHT 1982 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD., FORT
WORTH, TEXAS, 76137-2791, APPROVED
FORM. A.A.P.L. NO. 610 – 1982 REVISED

**ATTACHMENT**
3

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 2 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS | 2 |
| | D. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | TITLES | 2-3 |
| | A. TITLE EXAMINATION | 3 |
| | B. LOSS OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 4 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | C. EMPLOYEES | 4 |
| | D. DRILLING CONTRACTS | 4 |
| VI. | DRILLING AND DEVELOPMENT | 4-5 |
| | A. INITIAL WELL | 5 |
| | B. SUBSEQUENT OPERATIONS | 5 |
| | 1. Proposed Operations | 5-6-7 |
| | 2. Operations by Less than All Parties | 7 |
| | 3. Stand-By Time | 7 |
| | 4. Sidetracking | 7 |
| | C. TAKING PRODUCTION IN KIND | 8 |
| | D. ACCESS TO CONTRACT AREA AND INFORMATION | 8 |
| | E. ABANDONMENT OF WELLS | 8 |
| | 1. Abandonment of Dry Holes | 8-9 |
| | 2. Abandonment of Wells that have Produced | 9 |
| | 3. Abandonment of Non-Consent Operations | 9 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 9 |
| | A. LIABILITY OF PARTIES | 9 |
| | B. LIENS AND PAYMENT DEFAULTS | 9 |
| | C. PAYMENTS AND ACCOUNTING | 9-10 |
| | D. LIMITATION OF EXPENDITURES | 9-10 |
| | 1. Drill or Deepen | 10 |
| | 2. Rework or Plug Back | 10 |
| | 3. Other Operations | 10 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 10 |
| | F. TAXES | 11 |
| | G. INSURANCE | 11 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 11 |
| | A. SURRENDER OF LEASES | 11 |
| | B. RENEWAL OR EXTENSION OF LEASES | 11-12 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 12 |
| | D. MAINTENANCE OF UNIFORM INTEREST | 12 |
| | E. WAIVER OF RIGHTS TO PARTITION | 12 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 12 |
| IX. | INTERNAL REVENUE CODE ELECTION | 13 |
| X. | CLAIMS AND LAWSUITS | 13 |
| XI. | FORCE MAJEURE | 13 |
| XII. | NOTICES | 13 |
| XIII. | TERM OF AGREEMENT | 14 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 14 |
| | A. LAWS, REGULATIONS AND ORDERS | 14 |
| | B. GOVERNING LAW | 14 |
| | C. REGULATORY AGENCIES | 14 |
| XV. | OTHER PROVISIONS | 15 |
| XVI. | MISCELLANEOUS | |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___McMurry Energy Company_____, hereinafter designated and referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to individually herein as "Non-Operator", and collectively as "Non-Operators".

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas to the extent and as hereinafter provided.

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling unit as establish-ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

☑ A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to this agreement,
    (2) Restrictions, if any, as to depths, formations, or substances,
    (3) Percentages or fractional interests of parties to this agreement,
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement,
    (5) Addresses of parties for notice purposes.

☐ B. Exhibit "B", Form of Lease. (There is no Exhibit "B" to this agreement.)

☑ C. Exhibit "C", Accounting Procedure.

☑ D. Exhibit "D", Insurance.

☑ E. Exhibit "E", Gas Balancing Agreement.

☑ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.

☐ G. Exhibit "G", Tax Partnership. (There is no Exhibit "G" to this agreement.)

☐ H. Exhibit "H", Allocation of Cost and Production.

If any provision of any exhibit, except Exhibits "E" and "G", is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE III.
## INTERESTS OF PARTIES

A.  **Oil and Gas Interests:**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B", and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

B.  **Interests of Parties in Costs and Production:**

Unless changed by other provisions, and as provided in Exhibit "H" all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of those lease burdens set forth on Exhibit "A-1" or "" and other lease burdens as allocated on Exhibit "1" which shall be borne as hereinafter set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

C.  **Excess Royalties, Overriding Royalties and Other Payments:**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III.B., such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.

D.  **Subsequently Created Interests:**

If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in Exhibit "A-1", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"), and:

1.  If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

2.  If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.

## ARTICLE IV.
## TITLES

A.  **Title Examination:**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling operations or, if the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or planned to be included, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, royalty, overriding spacing or proration royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing leases and/or oil and gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each party hereto. The cost incurred by Operator in this title program shall be borne as follows: * or drilling block if located within a federal exploratory unit.

- 2 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE IV
continued

1   ☑   Option No. 2:  Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title examination
                                                                                        and curative work
2   (including preliminary, supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Drilling Parties
3   in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Ex-
4   hibit "A".  Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above
5   functions.

6        Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection
                                hereunder
7   with leases or oil and gas interests contributed by such party.  Operator shall be responsible for the preparation and recording of pooling
8   designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders.
9   This shall not prevent any party from appearing on its own behalf at any such hearing.

10

11       No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examined as above
12  provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties who are to par-
13  ticipate in the drilling of the well.

14

15

16  B.  Loss of Title:

17

18  ~~1.  Failure of Title:  Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a~~
19  ~~reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have ninety (90) days~~
20  ~~from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisi-~~
21  ~~tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining oil~~
22  ~~and gas leases and interests; and,~~
23  ~~(a)  The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be~~
24  ~~entitled to recover from Operator or the other parties any development or operating costs which it mayhave theretofore paid or incurred,~~
25  ~~but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~
26  ~~(b)  There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has~~
27  ~~been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has oc-~~
28  ~~curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract~~
29  ~~Area by the amount of the interest lost;~~
30  ~~(c)  If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is~~
31  ~~increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such in-~~
32  ~~terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such~~
33  ~~well;~~
34  ~~(d)  Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has~~
35  ~~failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties~~
36  ~~who bore the costs which are so refunded;~~
37  ~~(e)  Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be~~
38  ~~borne by the party or parties whose title failed in the same proportions in which they shared in such prior production; and,~~
39  ~~(f)  No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense of the interest~~
40  ~~claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear all expenses in~~
41  ~~connection therewith.~~
42
43  ~~2.  Loss by Non-Payment or Erroneous Payment of Amount Due:  If, through mistake or oversight, any rental, shut-in well~~
44  ~~payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest therein terminates,~~
45  ~~there shall be no monetary liability against the party who failed to make such payment.  Unless the party who failed tomake the required~~
46  ~~payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make proper payment,~~
47  ~~which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, effective as of the~~
48  ~~date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited with an interest in~~
49  ~~the Contract Area on account of ownership of the lease or interest which has terminated.  In the event the party who failed to make the~~
50  ~~required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and gas attributable to~~
51  ~~the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of such interest, it~~
52  ~~shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole previously drilled~~
53  ~~or well previously abandoned) from so much of the following as is necessary to effect reimbursement:~~
54  ~~(a)  Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on an acreage basis,~~
55  ~~up to the amount of unrecovered costs;~~
56  ~~(b)  Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of that portion of~~
57  ~~oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease~~
58  ~~termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the proceeds of said~~
59  ~~portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and,~~
60  ~~(c)  Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the interest~~
61  ~~lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~
62
63  3.  Other Losses:  All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses
64  and shall be borne by all parties in proportion to their interests.  There shall be no readjustment of interests in the remaining portion of
65  the Contract Area.
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982



**ARTICLE V.**
**OPERATOR**

A.  **Designation and Responsibilities of Operator:**

McMurry Energy Company _____ shall be the
Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and
required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall
have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross
negligence or willful misconduct.

B.  **Resignation or Removal of Operator and Selection of Successor:**

1.  Resignation or Removal of Operator:  Operator may resign at any time by giving written notice thereof to Non-Operators.
If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as
Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator
may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receivership, by the
and based on the interests owned in the shallowest formation
affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining
after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock A.M. on the
first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action
by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier
date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a cor-
porate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not
be the basis for removal of Operator.   See Article XV.4.

2.  Selection of Successor Operator:  Upon the resignation or removal of Operator, a successor Operator shall be selected by
the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor
Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest
based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or votes only to
succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based
on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed.

C.  **Employees:**

The number of employees used by Operator in conducting operations hereunder, their selection, and the hours of labor and the
compensation for services performed shall be determined by Operator, and all such employees shall be the employees of Operator.

D.  **Drilling Contracts:**

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so
desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therfor shall not exceed the prevailing
rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and
such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of in-
dependent contractors who are doing work of a similar nature.

**ARTICLE VI.**
**DRILLING AND DEVELOPMENT**

A.  Initial Wells

On or before the _____ day of _____, 19____, Operator shall commence the drilling of a well for
oil and gas at the following location:

and shall thereafter continue the drilling of the well with due diligence to

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling impractical, is en-
countered at a lesser depth, or unless all parties agree to complete or abandon the well at a lesser depth.

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and
gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or formations, in which
event Operator shall be required to test only the formation or formations to which this agreement may apply.

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VI
continued

1   ~~If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the~~
2   ~~well as a dry hole, the provisions of Article VI.B.1. shall thereafter apply.~~
3
4
5
6   B.  Subsequent Operations:
7
8       1.  Proposed Operations:  Should any party hereto desire to drill any well on the Contract Area ~~other than the well provided~~
9   ~~for in Article VI.A.~~ or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all
    <sub>capable of</sub>
10  the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the
11  other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective forma-
12  tion and the estimated cost of the operation.  The parties receiving such a notice shall have thirty (30) days after receipt of the notice
13  within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation.  If a drill-
14  ing rig is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response period shall be
15  limited to forty-eight (48) hours, exclusive of Saturday, Sunday, and legal holidays.  Failure of a party receiving such notice to reply within
16  the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.  Any notice or
17  response given by telephone shall be promptly confirmed in writing.
18
19
20
21      If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the notice
22  period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on loca-
23  tion, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all par-
24  ties hereto; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties,
25  for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain
26  permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title ex-
27  amination or curative matter required for title approval or acceptance.  Notwithstanding the force majeure provisions of Article XI, if the
28  actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and
29  if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accor-
30  dance with the provisions hereof as if no prior proposal had been made.
31
32
33
34      2.  Operations by Less than All Parties:  If any party receiving such notice as provided in Article VI.B.1.or VII.D.1. (Option
35  No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties
36  giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of
37  the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is
38  on location, as the case may be) actually commence the proposed operation and complete it with due diligence.  Operator shall perform all
39  work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is
40  a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such proposed opera-
41  tion for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work* Con-
42  senting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and con-
43  ditions of this agreement.
44
45
46
47      If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
48  notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as
49  to whether the Consenting Parties should proceed with the operation as proposed.  Each Consenting Party, within forty-eight (48) hours
50  (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit par-
51  ticipation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and
52  failure to advise the proposing party shall be deemed an election under (a).  In the event a drilling rig is on location, the time permitted for
53  such a response shall not exceed a total of forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays).  The proposing party,
54  at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.
55
56
57
58      The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have
59  elected to bear same under the terms of the preceding paragraph.  Consenting Parties shall keep the leasehold estates involved in such
60  operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.
61  If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their
62  sole cost, risk and expense.  If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a pro-
63  ducer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at their sole cost and risk,
64  * In the event any of the Consenting Parties elect to designate a Consenting Party as the Operator as a result of the current Operator
65  electing to be a Non-Consenting Party under Article VI.B.2 or VII.D.2, then the Consenting Parties shall elect which Consenting
66  Party shall be the Operator by the affirmative vote of two (2) or more Non-Operators owning a majority interest in the well after
67  excluding the interest of any Non-Consenting Parties.
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VI
continued

1 and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the Consenting Par-
2 ties. Upon commencement of operations for the drilling, reworking, deepening or plugging back of any such well by Consenting Parties
3 in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties,
4 and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting
5 Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or
6 market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding royalty and other in-
7 terests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest
8 until it reverts) shall equal the total of the following:

9
10
11
12     (a)  100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead
13 connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such
14 Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-
15 Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-
16 Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting
17 Party had it participated in the well from the beginning of the operations; and

18
19
20
21     (b)  300  % of that portion of the costs and expenses of drilling, reworking, deepening, plugging back, testing and completing,
22 after deducting any cash contributions received under Article VIII.C., and  300  % of that portion of the cost of newly acquired equip-
23 ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had
24 participated therein.

25
26
27
28     An election not to participate in the drilling or the deepening of a well shall be deemed an election not to participate in any re-
29 working or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent election applied that is
30 conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment account. Any such
31 reworking or plugging back operation conducted during therecoupment period shall be deemed part of the cost of operation of said well
32 and there shall be added to the sums to be recouped by the Consenting Parties one hundred percent (100%) of that portion of the costs of
33 the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it participated therein.  If
34 such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be ap-
35 plicable as between said Consenting Parties in said well.

36
37
38
39     During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the
40 proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other
41 taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Ar-
42 ticle III.D.

43
44
45
46     In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be permitted to use, free
47 of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon
48 abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall account for all such equip-
49 ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

50
51
52
53     Within sixty (60) days after the completion of any operation under this Article, the party conducting the operations for the
54 Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an
55 itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for production; or, at its
56 option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly bill-
57 ings.  Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the
58 operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities in-
59 curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and the amount of proceeds
60 realized from the sale of the well's working interest production during the preceding month.  In determining the quantity of oil and gas
61 produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to, metering or periodic
62 well tests.  Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation
63 which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs
64 of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as
65 above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

66
67
68
69
70

- 6 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VI

continued

On the first day of the month following the month in which

1 ~~At and when~~ the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,
2 the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-
3 Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production
4 therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, deepening or plugging
5 back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of
6 the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached hereto.

7

8

9
10 Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all parties, no wells shall
11 be completed in or produced from a source of supply with a well located elsewhere on the Contract Area is producing, unless such
12 well conforms to the then-existing well spacing pattern for such source of supply.

13

14

15 ~~The provisions of this Article shall have no application whatsoever to the drilling of the initial well described in Article VI.A.~~
16 ~~except (a) as to Article VI.D.1. (Option No. 2), if selected, or (b) as to the reworking, deepening and plugging back of such initial well~~
17 ~~after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initially completed for pro-~~
18 ~~duction, ceases to produce in paying quantities.~~
19

20

21

22 3. Stand-By Time:  When a well which has been drilled or deepened has reached its authorized depth and all tests have been
23 completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's notice proposing a
24 reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of the drilling or deepen-
25 ing operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever
26 first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second gram-
27 matical paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently
28 withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion
29 each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Par-
30 ties.
31

32

33

34 4. Sidetracking:  Except as hereinafter provided, those provisions of this agreement applicable to a "deepening" operation shall
35 also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to change the bottom hole
36 location (herein call "sidetracking"), unless done to straighten the hole or to drill around junk in the hole or because of other
37 mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not own an interest in the
38 affected well bore at the time of the notice shall, upon electing to participate, tender to the well bore owners its proportionate share (equal
39 to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized as follows:
40

41

42

43 (a)  If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in
44 the initial drilling of the well down to the depth at which the sidetracking operation is initiated.
45

46

47

48 (b)  If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on the basis of the well's
49 salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined in accordance with the
50 provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning.
51

52

53

54 In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on location, the response period
55 shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, any party may request and
56 receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by paying for all stand-by time
57 incurred during such extended response period. If more than one party elects to take such additional time to respond to the notice, stand
58 by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing par-
59 ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.  In all other in-
60 stances the response period to a proposal for sidetracking shall be limited to thirty (30) days.
61

62

63

64 C.  TAKING PRODUCTION IN KIND:
65

66 Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Contract Area,
67 exclusive of production which may be used in development and producing operations and in preparing the treating oil and gas for
68 marketing purposes and production unavoidably lost.  Any extra expenditure incurred in the taking in kind or separate disposition by any
69 party of its proportionate share of the production shall be borne by such party.  Any party taking its share of production in kind shall be
70

- 7 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VI
continued

1  required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

2

3      Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from
4  the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for
5  its share of all production.

6

7      In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of
8  the oil / produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not
   and / or gas                                                                                                        and / or gas
9  the obligation, to purchase such oil/or sell it to others at any time and from time to time, for the account of the non-taking party at the
       and / or gas                                                                                                          and / or gas
10  price which operator is receiving for its                                                                                  right of the
    that price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the
                                                                                                                    and / or gas
11  owner of the production to exercise at any time its right to take in kind, or separately dispose, of its share of all oil / not previously
                                                                                                       and / or gas
12  delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil / shall be only for such reasonable periods of
13  time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess
14  of one (1) year thirty (30) days.

15

16      In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or
17  deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to
18  be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing
19  agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

20

21  D.   Access to Contract Area and Information:

22

23      Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations,
24  and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books
25  and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with
26  governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of
27  each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area.  The cost of
28  gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator that re-
29  quests the information.

30

31  E.   Abandonment of Wells:
                                                                         for which the Consenting Parties have not been fully reimbursed
32                                                                         pursuant to Article VI.B.2./ any well which has been
33      1.  Abandonment of Dry Holes:  Except for any well drilled or deepened as is proposed to be completed as a dry hole shall not be plugged and abandoned
34  drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned
35  without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply
36  within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposal to plug and abandon
37  such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in
38  accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or deepening
39  such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further
40  operations in search of oil and/or gas subject to the provisions of Article VI.B.

41

42      2.  Abandonment of Wells that have Produced:  Except for any well in which a Non-Consent operation has been conducted
43  hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a
44  producer shall not be plugged and abandoned without the consent of all parties.  If all parties consent to such abandonment, the well shall
45  be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within
46  thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well,
47  those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other
48  parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of
49  Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign
50  the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and
51  material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the in-
52  terval or intervals of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and
53  gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or in-
54  tervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is pro-
55  duced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form attached as Exhibit

56
57
58
59
60
61
62
63
64
65
66
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VI
continued

1  ="B". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the
2  assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the
3  Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of
4  interests in the remaining portion of the Contract Area.

5
6      Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from
7  the well in the interval or intervals then open other than their royalties retained in any lease made under the terms of this Article. Upon re-
8  quest, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges con-
9  templated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned
10  well. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignee-lessor shall then have the option to
11  repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the pro-
12  visions hereof.

13
14      3.   Abandonment of Non-Consent Operations:  The provisions of Article VI.E.1. or VI.E.2 above shall be applicable as between
15  Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be
16  permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified
17  of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article
18  VI.E.

19
20                                ARTICLE VII.
21                    EXPENDITURES AND LIABILITY OF PARTIES

22
23  A.   Liability of Parties:

24
25      The liability of the parties shall be several, not joint or collective.  Each party shall be responsible only for its obligations, and
26  shall be liable only for its proportionate share of the costs of developing and operating the Contract Area.  Accordingly, the liens granted
27  among the parties in Article VII.B. are given to secure only the debts of each severally.  It is not the intention of the parties to create, nor
28  shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners.

29
30  B.   Liens and Payment Defaults:

31
32      Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security interest in its share
33  of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together with interest thereon
34  at the rate provided in Exhibit "C".  To the extent that Operator has a security interest under the Uniform Commercial Code of the
35  state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code.  The bringing of a suit and the ob-
36  taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien
37  rights or security interest as security for the payment thereof.  In addition, upon default by any Non-Operator in the payment of its share
38  of expense, Operator shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from
39  the sale of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest, has been paid.  Each
40  purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default.  Operator grants a like lien
41  and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

42
43      If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by
44  Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that
45  the interest of each such party bears to the interest of all such parties.  Each party so paying its share of the unpaid amount shall, to obtain
46  reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.

47
48  C.   Payments and Accounting:

49
50      Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development
51  and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective propor-
52  tionate shares upon the expense basis provided in Exhibit "C".  Operator shall keep an accurate record of the joint account hereunder,
53  showing expenses incurred and charges and credits made and received.

54
55      Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance
56  of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding
57  month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together
58  with an invoice for its share thereof.  Each such statement and invoice for the payment in advance of estimated expense shall be submitted
59  on or before the 20th day of the next preceding month.  Each party shall pay to Operator its proportionate share of such estimate within
60  thirty (30) days after such estimate and invoice is received.  If any party fails to pay its share of said estimate within said time, the amount
61  due shall bear interest as provided in Exhibit "C" until paid.  Proper adjustment shall be made monthly between advances and actual ex-
62  pense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

63
64  D.   Limitation of Expenditures:

65
66      1. Drill or Deepen:  Without the consent of all parties, no well shall be drilled or deepened, except any well drilled or deepened
67  pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the drilling or deepening shall include:

68
69
70

-9-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982
ARTICLE VII
continued

☐ Option No. 1:  All necessary expenditures for the drilling or deepening, testing, completing and equipping of the well, including necessary tankage and/or surface facilities.

☒ Option No. 2:  All necessary expenditures for the drilling or deepening and testing of the well.  When such well has reached its authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators who have the right to participate in the completion costs.  The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing and the completion attempt.  Such election, when made, shall include consent to all necessary expenditures for the completing and equipping of such well, including necessary tankage and/or surface facilities.  Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the completion attempt.  If one or more, but less than all of the parties, elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, deepening or plugging back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereafter conducted by less than all parties.

2. Rework or Plug Back:  Without the consent of all parties, no well shall be reworked or plugged back except a well reworked or plugged back pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the reworking or plugging back of a well shall include all necessary expenditures in conducting such operations and completing and equipping of said well, including necessary tankage and/or surface facilities.

3. Other Operations:  Without the consent of all parties, Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____ Twenty-five Thousand _____ Dollars ($ _____ 25,000.00 _____ ) except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator shall, as promptly as possible, shall report the emergency to the other parties.  If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of _____ Twenty-five Thousand _____ Dollars ($ _____ 25,000.00 _____ ) but less than the amount first set forth above in this paragraph.

E.  Rentals, Shut-in Well Payments and Minimum Royalties:

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement, and charged to the parties owning an interest in such lands and at their expense.  In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties.  Any party may request, and shall be entitled to receive, proper evidence of all such payments.  In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shutting in or return to production of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest opportunity permitted by circumstances, prior to taking such action, but assumes no liability for failure to do so.  In the event of failure by Operator to so notify Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

F.  Taxes:

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent.  Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests contributed by such Non-Operator.  If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction.  If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest.  Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C".

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination.  During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty.  When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C".

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of oil and/or gas produced under the terms of this agreement.  In the event Operator is required by governmental authority as primarily liable for such taxes, the Operator may withhold sums sufficient to properly pay such taxes from production revenues or establish a reserve for the payment of such taxes through joint interest billings to the parties.

- 10 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VII
continued

1 G.  Insurance:
2
3      At all times while operations are conducted hereunder, Operator shall comply with the workmen's compensation law of
4 the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said com-
5 pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C". Operator shall
6 also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached to and made a part
7 hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's compensation
8 law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.
9
10     In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives the approval of the
11 parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.
12
13                                        ARTICLE VIII.
14                        ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST
15
16 A.  Surrender of Leases:
17
18     The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
19 or in part unless all parties consent thereto.
20
21     However, should any party desire to surrender its interest in any lease or in any portion thereof, and the other parties do not
22 agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in
23 such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
24 thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an oil and gas in-
25 terest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering
26 such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land covered thereby, such
27 lease to be on the form attached hereto as Exhibit "H". Upon such assignment or lease, the assigning party shall be relieved from all
28 obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well
29 attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and pro-
30 duction other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the
31 party assignor or lessor the reasonable salvage value of the latter's interest in any wells and equipment attributable to the assigned or leas-
32 ed acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less the estimated cost of
33 salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than one party, the interest
34 shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.
35
36     Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
37 party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
38 assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
39 agreement identical to this agreement.
40
41 B.  Renewal or Extension of Leases:
42
43     If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be notified promptly, and
44 shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in the ownership of the
45 renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it their several proper pro-
46 portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be in proportion to the
47 interests held at that time by the parties in the Contract Area.
48
49     If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties
50 who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area
51 to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal lease.
52 Any renewal lease in which less than all parties elect to participate shall not be subject to this agreement.
53
54     Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportionate interest therein
55 by the acquiring party.
56
57     The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered by the expiring lease
58 or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predecessor lease, or taken or
59 contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but any lease taken or con-
60 tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and shall not be subject to
61 the provisions of this agreement.
62
63     The provisions in this Article shall also be applicable to extensions of oil and gas leases.
64
65 C.  Acreage or Cash Contributions:
66
67     While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
68 operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be
69 applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the con-
70 tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions

- 11 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VIII
continued

1   said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be
2   governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions
3   it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to op-
4   tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Area.

5
6   If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
7   consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

8
9   D.   Maintenance of Uniform Interests: **

10
11   ~~For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this agreement, no~~
12   ~~party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells,~~
13   ~~equipment and production unless such disposition covers either:~~

14
15   ~~1.   the entire interest of the party in all leases and equipment and production; or~~

16
17   ~~2.   an equal undivided interest in all leases and equipment and production in the Contract Area.~~

18
19   Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
20   and shall be made without prejudice to the right of the other parties.

21
22   If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
23   require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
24   and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
25   party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter
26   into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced from the Contract
27   Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

28
29   E.   Waiver of Rights to Partition:

30
31   If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32   undivided interest in the Contract Area waives any and all rights it may have to partition and has set aside to it in severalty its undivided
33   interest therein.

34
35   F.   ~~Preferential Right to Purchase:~~ NOTICE OF SALE:

36
37   Should any party ~~desire to sell~~ all or any part of its interests under this agreement, or its rights and interests in the Contract
38   Area, it shall promptly give written notice to the other parties, ~~with full information concerning its proposed sale, which shall include the~~
39   ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms~~
40   ~~of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase~~
41   ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchas-~~
42   ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing par-~~
43   ~~ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to~~
44   ~~dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent com-~~
45   ~~pany or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.~~

46
47   ARTICLE IX.
48   INTERNAL REVENUE CODE ELECTION

49
50   This agreement is not intended to create, and shall not be construed to create, a relationship of partnership or an association
51   for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities hereunder are several
52   and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for federal income tax
53   purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected elects / to be excluded
        *effective January 1, 2001*
54   from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Code of 1986, as per-
55   mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to ex-
56   ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the
57   United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements,
58   and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby affected give further
59   evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the
60   Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other
61   action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
62   Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K", Chapter 1,
63   Subtitle "A", of the Internal Revenue Code of 1986, under which an election similar to that provided by Section 761 of the Code is per-
64   mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing elec-
65   tion, each such party states that the income derived by such party from operations hereunder can be adequately determined without the
66   computation of partnership taxable income.

67   ** In the event of any transfer, sale, encumbrance or other disposition of interest within the Contract Area which creates the
68   necessity of separate measurement (s) of production, the party creating such necessity shall alone bear the cost of the purchase,
        installation, and operation of such facilities necessary for the separate measurement.

69
70

- 12 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982



ARTICLE X.
CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed \*\*\*\*\*\*\*\*Twenty-five Thousand and no/100\*\*\*\*\*\*\*\* _____ Dollars ($ ___25,000.00___ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

ARTICLE XI.
FORCE MAJEURE

If any party is rendered unable, wholly or in part, by forcemajeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the forcemajeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the forcemajeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

ARTICLE XII.
NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex ortelecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex ortelecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

ARTICLE XIII.
TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas interest contributed by any other party beyond the term of this agreement.

☑ Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as in any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☐ ~~Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____ days from the date of abandonment of said well.~~

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

- 13 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XIV.
COMPLIANCE WITH LAWS AND REGULATIONS

A.  Laws, Regulations and Orders:

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders.

B.  Governing Law:

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ Wyoming _____ shall govern.

C.  Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation or application was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applicable to such Non-Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

~~Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted to the purchaser of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall Profit Tax Act of any crude oil sold hereunder", or same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Treasury Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.~~

ARTICLE XV.
OTHER PROVISIONS

**SEE ATTACHED**

Attached to and made a part of that certain Operating Agreement dated October 25, 2001 by and between McMurry Energy Company, as Operator and Ultra Resources, Inc., et al as Non-Operator(s).

ARTICLE XV
OTHER PROVISIONS

1.   **Tax Payments**

Operator shall pay or cause to be paid all taxes, either State or Federal owing or which may be payable on production from the Contract Area, whether in the form of a severance or production tax; provided, however, if at anytime any party is taking its share of production in kind, such party shall pay or cause to be paid said taxes as to such production.

2.   **Priority of Operations**

If at any time there is more than one operation proposed in connection with any well subject to this Agreement, and in the event the parties hereto failed to mutually agree as to the conduct of operations hereunder, the following elections shall control in the order hereafter enumerated: (i) conduct logging, coring, testing, wireline formation testing or evaluation operations; (ii) complete the well in the primary objective formation; (iii) deepen the well to a deeper productive horizon (and if there is more than one proposal to deepen, the proposals shall be considered in descending order); (iv) plug back the well and complete it in a shallower zone; (v) sidetrack to another bottom-hole location; and (vi) plug and abandon the well.

It is provided, however, that if at the time the Consenting Parties are considering any of the above elections, the hole is in such a condition that a reasonable, prudent operator would not conduct the operations contemplated by the particular election involved for fear of placing the hole in jeopardy or losing same prior to completing the well, such election shall be given the priority hereinabove set forth without the approval of all Consenting Parties. No preference will be given when there is an operation posing an unreasonable risk to life or property.

3.   **Conflict Between Provisions**

In the event of any conflict between the provisions of this Article XV and the other provisions of this Operating Agreement, the provision of this Article XV shall control.

4.   **Transfer of Interest by Operator:**

Notwithstanding the provisions of Article V.B., or any other provisions of this agreement, a change of name or entity structure of Operator or a transfer by Operator of all of Operator's interest to a subsidiary or parent whether a corporation or limited liability company shall not require Operator to resign or be the basis to remove Operator.

5.   **Allocation of Costs and Production**

The parties recognize the lands subject to this agreement have varying interest by depth as to some of the parties to this agreement. Exhibit "H" attached hereto provides for the allocation of costs and production, recognizing these varying interests, therefore whenever this agreement provides for the use of the interests as described on Exhibit "A", should the interests be determined by virtue of Exhibit "H", then such interests as calculated per Exhibit "H" shall be used. Not withstanding anything to the contrary contained in Exhibit "H", no party that has an interest that does not vary by depth shall be required to pay more costs or share in production to any less interest than such parties' actual ownership.

6.   **Termination of Prior JOA**

As to the signatory parties to this agreement, this operating agreement shall cancel, replace and supercede that certain operating agreement attached to that certain Farmout Agreement dated July 16, 1996 between Meridian Oil Company and McMurry Oil Company.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes

IN WITNESS WHEREOF, this agreement shall be effective as of this 25th day of October, 2001.

McMurry Energy Company _____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alternations, or modifications, other than those in Articles IV.A. and B.., VI. VII.C, E, F, VIII, A, D, F, O.B, XIV.C have been made to the form.

OPERATOR

McMurry Energy Company

_____
Steve Van Hook, Attorney-in-Fact

NON-OPERATORS

Nerd Energy, Inc.                                  Williams Production Rocky Mountain Company

By:_____           By:_____
Title:_____         Title:_____

Fort Collins Consolidated Royalties, Inc.          Ultra Resources, Inc.

By:_____           By:_____
Title:_____         Title:_____

Lance Oil & Gas Company, Inc.                      ST Oil Company

By:_____           By:_____
Title:_____         Title:_____

Ill Exploration Company.

By:_____           By:_____
Title:_____         Title:_____

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes

IN WITNESS WHEREOF, this agreement shall be effective as of this 25th day of October, 2001.

McMurry Energy Company _____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alternations, or modifications, other than those in Articles _IV.A._ and _B._, _VI._ VII.C., D., E., VIII, A., D., E., VI.B., XIV.C. have been made to the form.

OPERATOR

McMurry Energy Company


_____          _____
Steve Van-Hook, Attorney-in-Fact


NON-OPERATORS


Nerd Energy, Inc.                                    Williams Production Rocky Mountain Company


_Cary E. Brus_                                       By:_____
By:___CARY E. BRUS_____                          Title:_____
Title:___V.P._____


Fort Collins Consolidated Royalties, Inc.            Ultra Resources, Inc.


_____                    _____
By:_____                    By:_____
Title:_____                    Title:_____


Lance Oil & Gas Company, Inc.                        ST Oil Company


_____                    _____
By:_____                    By:_____
Title:_____                    Title:_____


III Exploration Company.


_____                    _____
By:_____                    By:_____
Title:_____                    Title:_____

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes

IN WITNESS WHEREOF, this agreement shall be effective as of this 25th day of October, 2001.

McMurry Energy Company _____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alternations, or modifications, other than those in Articles IV.A. and B., VI. VI.C.E., F., VIII. A, D, F, V.B., XIV.C. have been made to the form.

OPERATOR

McMurry Energy Company

_____
Steve Van-Hook, Attorney-in-Fact

NON-OPERATORS

Nerd Energy, Inc.                                    Williams Production Rocky Mountain Company

By:_____          By: **Dorsey Roach**
Title:_____          Title: **Attorney-in-Fact**

Fort Collins Consolidated Royalties, Inc.            Ultra Resources, Inc.

By:_____          By:_____
Title:_____          Title:_____

Lance Oil & Gas Company, Inc.                        ST Oil Company

By:_____          By:_____
Title:_____          Title:_____

III Exploration Company.

By:_____          By:_____
Title:_____          Title:_____

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

### ARTICLE XVI.
### MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes

IN WITNESS WHEREOF, this agreement shall be effective as of this 25th day of October, 2001.

McMurry Energy Company _____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL 610-1982 Model Form Operating Agreement, as published from by Forms On-A-Disk, Inc. No changes, alternations, or modifications, other than those in Articles IV.A. and II., VI, VII.C., E., F., VIII., A., D., E., V.B., XIV.C. have been made to the form.

#### OPERATOR

McMurry Energy Company


_____
Steve Van-Hook, Attorney-in-Fact


#### NON-OPERATORS

Nerd Energy, Inc.                                           Williams Production Rocky Mountain Company


By:_____                                 By:_____
Title:_____                                 Title:_____


Fort Collins Consolidated Royalties, Inc.                   Ultra Resources, Inc.


By: *Roger J. Biemans*                                      By:_____
Title: *President*                                          Title:_____


Lance Oil & Gas Company, Inc.                               ST Oil Company


By:_____                                 By:_____
Title:_____                                 Title:_____


III Exploration Company.


By:_____                                 By:_____
Title:_____                                 Title:_____

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes

IN WITNESS WHEREOF, this agreement shall be effective as of this 25th day of October, 2001.

McMurry Energy Company _____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles _IV.A._ and _B._, _VI.B., C, F, VIII, A, D, E, V.R. XIV.C._ have been made to the form.

OPERATOR

McMurry Energy Company


Steve Van Hook, Attorney-in-Fact


NON-OPERATORS


Nerd Energy, Inc.                                    Williams Production Rocky Mountain Company


By:_____                          By:_____
Title:_____                        Title:_____


Fort Collins Consolidated Royalties, Inc.            Ultra Resources, Inc. _Robin Benko_

By:_____                          By:___Robin Benko___
Title:_____                        Title:___Attorney-in-Fact___


Lance Oil & Gas Company, Inc.                        ST Oil Company


By:_____                          By:_____
Title:_____                        Title:_____


Ill Exploration Company.


By:_____                          By:_____
Title:_____                        Title:_____

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes

IN WITNESS WHEREOF, this agreement shall be effective as of this 25th day of October, 2001.

McMurry Energy Company _____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alternations, or modifications, other than those in Articles __IV A. and B., VI, VII C, E, F, VIII A, D, F, VII, XIV C__ have been made to the form.

O P E R A T O R

McMurry Energy Company

_____
Steve Van-Hook, Attorney-in-Fact

N O N - O P E R A T O R S

Nerd Energy, Inc.                                         Williams Production Rocky Mountain Company

_____            _____
By:_____            By:_____
Title:_____            Title:_____

Fort Collins Consolidated Royalties, Inc.                 Ultra Resources, Inc.

_____            _____
By:_____            By:_____
Title:_____            Title:_____

Lance Oil & Gas Company, Inc.                             ST Oil Company

_____            _____
By:_____            By:_____
Title:_____            Title:_____

III Exploration Company

_____            _____
By:_____            By:_____
Title:_President_____            Title:_____

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.
MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes

IN WITNESS WHEREOF, this agreement shall be effective as of this 25th day of October, 2001.

McMurry Energy Company                , who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published

in diskette form by Forms On-A-Disk, Inc. No changes, alternations, or modifications, other than those in Articles   IV.A.  and B.   VI.
VIII., C, F, VIII, A, D, F, VII, XIV.C                                                               , have been made to the form.

OPERATOR

McMurry Energy Company


_____          _____
Steve Van Hook, Attorney-in-Fact


NON-OPERATORS


Nerd Energy, Inc.                                  Williams Production Rocky Mountain Company

_____          _____
By:_____          By:_____
Title:_____          Title:_____


Fort Collins Consolidated Royalties, Inc.          Ultra Resources, Inc.

_____          _____
By:_____          By: _____
Title:_____          Title: _____


Lance Oil & Gas Company, Inc.                      ST Oil Company

_____          _____
By:_____          By: _Ismael Butler_____
Title:_____          Title: _President_____


III Exploration Company.

_____          _____
By:_____          By:_____
Title:_____          Title:_____

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XVI.
## MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes

IN WITNESS WHEREOF, this agreement shall be effective as of this 25th day of October, 2001.

McMurry Energy Company _____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alternations, or modifications, other than those in Articles IV.A. and B., VI, VII.C., E., F., VIII, A., D., F., V.B., XIV.C. have been made to the form.

### OPERATOR

McMurry Energy Company


_____          _____
Steve Van Hook, Attorney-in-Fact


### NON-OPERATORS

Nerd Energy, Inc.                                    Williams Production Rocky Mountain Company


_____          _____
By:_____          By:_____
Title:_____          Title:_____


Fort Collins Consolidated Royalties, Inc.            Ultra Resources, Inc.


_____          _____
By:_____          By:_____
Title:_____          Title:_____


Lance Oil & Gas Company, Inc.                        ST Oil Company


_____          _____
By: J. BURTON JONES                         By:_____
Title: V.P. Business Development & Land      Title:_____


III Exploration Company.


_____          _____
By:_____          By:_____
Title:_____          Title:_____

- 15 -

STATE OF COLORADO)
                 )§
COUNTY OF DENVER )

The foregoing instrument was acknowledged before me this _1st_ day of _October_ 2001 by Steve Van Hook, Attorney-in-Fact for McMurry Energy Company, a Delaware corporation, on behalf of the corporation.

Witness my hand and official seal.

_Annette B Johnson_
Notary Public

My commission expires: _11-30-2002_

My Commission Expires 11/30/2002

STATE OF _____)
                         )§
COUNTY OF _____)

The foregoing instrument was acknowledged before me this ____ day of _____, 2001, by _____, as _____ of Nerd Energy, Inc. a Wyoming corporation, on behalf of the corporation.

Witness my hand and official seal.

_____
Notary Public

SEAL

My commission expires: _____

STATE OF_____)
                        )§
COUNTY OF _____)

The foregoing instrument was acknowledged before me this ____ day of _____, 2001, By _____ as _____ for Fort Collins Consolidated Royalties, Inc. a Wyoming corporation, on behalf of the corporation.

Witness my hand and official seal.

_____
Notary Public

SEAL

My commission expires: _____

STATE OF_____)
                        )§
COUNTY OF _____)

The foregoing instrument was acknowledged before me this ____ day of _____, 2001, By _____ as _____ for Williams Production Rocky Mountain Company, a _____ corporation, on behalf of the corporation.

Witness my hand and official seal.

_____
Notary Public

SEAL

My commission expires: _____

STATE OF **COLORADO** )
                      )§
COUNTY OF **DENVER**  )

The foregoing instrument was acknowledged before me this _____ day of _____, 2001 by **Steve Van Hook, Attorney -in-Fact for McMurry Energy Company, a**  Delaware corporation, on behalf of the corporation.

Witness my hand and official seal.

_____
Notary Public

SEAL

My commission expires: _____

STATE OF _Wyoming_   )
                     )§
COUNTY OF _Natrona_  )

The foregoing instrument was acknowledged before me this _19th_ day of _October_, 2001, by _Cary E. Brus_, as _Vice President_ of Nerd Energy, Inc. a Wyoming corporation, on behalf of the corporation.

Witness my hand and official seal.

_Thomas B. Blevin_
Notary Public

THOMAS R. BLEVINS- NOTARY PUBLIC
County of          State of
Natrona            Wyoming
My Commission Expires April 6, 2003

My commission expires: _6 April 2003_

STATE OF _____ )
                         )§
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 2001, By _____ as _____ for Fort Collins Consolidated Royalties, Inc. a Wyoming corporation, on behalf of the corporation.

Witness my hand and official seal.

_____
Notary Public

SEAL

My commission expires: _____

STATE OF _____ )
                         )§
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 2001, By _____ as _____ for Williams Production Rocky Mountain Company, a _____ corporation, on behalf of the corporation.

Witness my hand and official seal.

_____
Notary Public

SEAL

My commission expires: _____

STATE OF **COLORADO**)
                      )§
COUNTY OF **DENVER**  )

    The foregoing instrument was acknowledged before me this _____ day of _____, 2001
by Steve Van Hook, Attorney-in-Fact for McMurry Energy Company, a Delaware corporation, on behalf of
the corporation.

        Witness my hand and official seal.

                                    _____
                                    Notary Public

      SEAL

      My commission expires: _____


STATE OF_____)
                      )§
COUNTY OF _____)

    The foregoing instrument was acknowledged before me this ____ day of _____, 2001,
by _____, as _____ of Nerd Energy, Inc. a Wyoming
corporation, on behalf of the corporation.

        Witness my hand and official seal.

                                      _____
                                    Notary Public

      SEAL

      My commission expires: _____


STATE OF_____)
                      )§
COUNTY OF _____)

    The foregoing instrument was acknowledged before me this ____ day of _____, 2001,
By _____ as _____ for Fort Collins Consolidated Royalties, Inc. a
Wyoming corporation, on behalf of the corporation.

        Witness my hand and official seal.

                                      _____
                                    Notary Public

      SEAL

      My commission expires: _____


STATE OF ___Oklahoma___)
                      )§
COUNTY OF _Tulsa_____)

    The foregoing instrument was acknowledged before me this _24th_day of __Oct___, 2001,
By _Dorsey Roach___ as _Attorney in Fact_ for Williams Production Rocky Mountain Company, a
_Delaware____ corporation, on behalf of the corporation.

    Witness my hand and official seal.

                              *Susan A. Tyler*
                                  Notary Public

      SEAL

      My commission expires: ___7-17-2005___

Notary Public Oklahoma
**OFFICIAL SEAL**
SUSAN A. TYLER
TULSA COUNTY
Comm. Exp. 07-17-2005

STATE OF **COLORADO**)
                    )§
COUNTY OF **DENVER**  )

    The foregoing instrument was acknowledged before me this _____ day of _____, 2001 by Steve Van Hook, Attorney -in-Fact for McMurry Energy Company, a Delaware corporation, on behalf of the corporation.

    Witness my hand and official seal.

                            _____
                            Notary Public

    SEAL

    My commission expires: _____

STATE OF_____)
                  )§
COUNTY OF _____)

    The foregoing instrument was acknowledged before me this ____ day of _____, 2001, by _____, as _____of Nerd Energy, Inc. a Wyoming corporation, on behalf of the corporation.

    Witness my hand and official seal.

                            _____
                            Notary Public

    SEAL

    My commission expires: _____

STATE OF_____)
                  )§
COUNTY OF _____)

    The foregoing instrument was acknowledged before me this ____ day of _____, 2001, By _____ as _____ for Fort Collins Consolidated Royalties, Inc. a Wyoming corporation, on behalf of the corporation.

    Witness my hand and official seal.

                            _____
                            Notary Public

    SEAL

    My commission expires: _____

STATE OF_____)
                  )§
COUNTY OF _____)

    The foregoing instrument was acknowledged before me this ____ day of _____, 2001, By_____ as _____ for Williams Production Rocky Mountain Company, a _____ corporation, on behalf of the corporation.

    Witness my hand and official seal.

                            _____
                            Notary Public

    SEAL

    My commission expires: _____

STATE OF COLORADO   )
                  )ss.
COUNTY OF DOUGLAS  )

    The foregoing instrument was acknowledged before me this 26th day of October, 2001, by Robin Benko, as Attorney-in-Fact of **Ultra Resources, Inc.,** a Wyoming corporation, on behalf of the corporation.

    Witness my hand and official seal.

                               _Roselind Meyer_
                               Notary Public

SEAL

    My commission expires: January 15, 2005


STATE OF _____)
                  )ss.
COUNTY OF _____)

    The foregoing instrument was acknowledged before me this _____ day of _____, 2001, by _____, as _____ for **Lance Oil & Gas Company, Inc.,** a _____ _____ corporation, on behalf of the corporation.

    Witness my hand and official seal.

                    _____
                         Notary Public

   SEAL

    My commission expires: _____

STATE OF_____)
                        )§
COUNTY OF _____)

      The foregoing instrument was acknowledged before me this ____ day of _____, 2001, by _____, as _____ of Ultra Resources, Inc., a _____ corporation, on behalf of the corporation.

      Witness my hand and official seal.

                          _____
                          Notary Public

    SEAL

    My commission expires: _____

STATE OF_____)
                        )§
COUNTY OF _____)

      The foregoing instrument was acknowledged before me this ____ day of _____, 2001, By _____ as _____ for Lance Oil & Gas Company, Inc.. a _____ corporation, on behalf of the corporation.

      Witness my hand and official seal.

                          _____
                          Notary Public

    SEAL

    My commission expires: _____

STATE OF_____)
                        )§
COUNTY OF _____)

      The foregoing instrument was acknowledged before me this ____ day of _____, 2001, By_____ as _____ for ST Oil Company, a _____ corporation, on behalf of the corporation.

      Witness my hand and official seal.

                          _____
                          Notary Public

    SEAL

    My commission expires: _____

STATE OF _Idaho_____)
                        )§
COUNTY OF _Ada_____)

      The foregoing instrument was acknowledged before me this _24th_ day of _Oct_, 2001, By _William C Glynn_ as _president_ for III Exploration Company, a _Idaho_____ corporation, on behalf of the corporation.

      Witness my hand and official seal.

                          _D. Kent Little_
                          Notary Public

    My commission expires: _Nov 9 2006_

**D. KENT LITTLE**
**NOTARY**
**PUBLIC**
**STATE OF IDAHO**

STATE OF_____)
                        )§
COUNTY OF _____)

     The foregoing instrument was acknowledged before me this ____ day of _____, 2001, by _____, as _____ of Ultra Resources, Inc., a _____ corporation, on behalf of the corporation.

     Witness my hand and official seal.

                          _____
                          Notary Public

    SEAL

     My commission expires: _____


STATE OF_____)
                        )§
COUNTY OF _____)

     The foregoing instrument was acknowledged before me this ____ day of _____, 2001, By _____ as _____ for Lance Oil & Gas Company, Inc.. a _____ corporation, on behalf of the corporation.

     Witness my hand and official seal.

                          _____
                          Notary Public

    SEAL

     My commission expires: _____


STATE OF *Colorado* )
                     )§
COUNTY OF *Denver* )

     The foregoing instrument was acknowledged before me this *19th* day of *Oct.*, 2001, By *J. Samuel Butler* as *President* for ST Oil Company, a *Nevada* corporation, on behalf of the corporation.

     Witness my hand and official seal.

                          *Pamela K. Real*
                          Notary Public

    SEAL

     My commission expires: _____

         My Commission Expires 04/14/2003


STATE OF_____)
                        )§
COUNTY OF _____)

     The foregoing instrument was acknowledged before me this ____ day of _____, 2001, By_____ as _____ for III Exploration Company, a _____ corporation, on behalf of the corporation.

     Witness my hand and official seal.

                          _____
                          Notary Public

    SEAL

     My commission expires: _____

STATE OF_____)
                       )§
COUNTY OF _____)

    The foregoing instrument was acknowledged before me this ____ day of _____, 2001,
by _____, as _____ of Ultra Resources, Inc., a
_____ corporation, on behalf of the corporation.

    Witness my hand and official seal.

                           _____
                           Notary Public

SEAL

    My commission expires: _____


STATE OF____COLORADO____)
                        )§
COUNTY OF ___ADAMS____)

    The foregoing instrument was acknowledged before me this ____ day of _____, 2001,
By J. BURTON JONES as V.P.-Bus.Dev.& Land for Lance Oil & Gas Company, Inc.. a
_____ corporation, on behalf of the corporation.

    Witness my hand and official seal.

                           *Rosalyne I. Condos*
                           Notary Public Rosalyne I. Condos

    My commission expires: 09-16-2004_____


STATE OF_____)
                       )§
COUNTY OF _____)

    The foregoing instrument was acknowledged before me this ____ day of _____, 2001,
By _____ as _____ for ST Oil Company, a _____ corporation,
on behalf of the corporation.

    Witness my hand and official seal.

                           _____
                           Notary Public

SEAL

    My commission expires: _____


STATE OF_____)
                       )§
COUNTY OF _____)

    The foregoing instrument was acknowledged before me this ____ day of _____, 2001,
By _____ as _____ for III Exploration Company, a _____
corporation, on behalf of the corporation.

    Witness my hand and official seal.

                           _____
                           Notary Public

SEAL

    My commission expires: _____

EXHIBIT "A"

Attached to and made a part of that certain Operating Agreement dated October 25, 2001, between McMurry Energy Company as Operator, and Ultra Resources, Inc, et al, as Non-Operator(s).

1.   **LANDS SUBJECT TO THIS AGREEMENT**

Block B (part)
Township 31 North, Range 109 West, 6th P.M.
Section 13: NE/4, SW/4
Section 14: NE/4

Block A (part)
Township 31 North, Range 109 West, 6th P.M.
Section 2: SW/4
Section 3: Lots 1, 2, S/2 NE/4, SW/4

2.   **DEPTH RESTRICTIONS**

This agreement covers all depths, however the interests of the parties as shown in Paragraph 3 below varies as to the depths shown.

3.   **PERCENTAGE INTERESTS OF PARTIES**

A.   Township 31 North, Range 109 West, 6th P.M.
Section 14: NE, but only insofar as production from the Pinedale 1-14 wellbore

1. Surface down to 200 feet below the stratigraphic equivalent of 9,731 feet being total depth in the Pinedale 1-14 well located in the NENE of Section 14-T31N-R109W.

| Party | *Before Payout of the PF 1-14 well | *After Payout of the PF 1-14 well |
|---|---|---|
| McMurry Energy Company | 49.50000% | 40.218750% |
| Nerd Energy, Inc. | 24.75000% | 20.109375% |
| Fort Collins Consolidated Royalties, Inc. | 23.75000% | 19.296875% |
| Williams Production Rocky Mountain Company | 2.00000% | 1.625000% |
| Ultra Resources, Inc.* | 0.00000% | 15.937500% |
| Lance Oil & Gas Company, Inc.* | 0.00000% | 2.812500% |
| Total | 100.00000% | 100.000000% |

*assuming election to convert to payout as provided in that certain July 16, 1996 Farmout Agreement between Meridian Oil Company and McMurry Oil Company and further subject to the terms of said agreement.

B.   Township 31 North, Range 109 West, 6th P.M.
Section 14: NE, but excluding the Pinedale 1-14 wellbore

1. Surface down to 200 feet below the stratigraphic equivalent of 9,731 feet being total depth in the Pinedale 1-14 well located in the NENE of Section 14-T31N-R109W.

| Party | *Before Payout of the PF 1-14 well | *After Payout of the PF 1-14 well |
|---|---|---|
| McMurry Energy Company | 44.05500% | 34.77375% |
| Nerd Energy, Inc. | 22.02750% | 17.386875% |
| Fort Collins Consolidated Royalties, Inc. | 21.13750% | 16.684375% |
| Williams Production Rocky Mountain Company | 1.78000% | 1.405000% |
| ST Oil Company | 2.75000% | 2.75000% |
| III Exploration Company | 8.25000% | 8.25000% |
| Ultra Resources, Inc.* | 0.00000% | 15.937500% |
| Lance Oil & Gas Company, Inc.* | 0.00000% | 2.812500% |
| Total | 100.00000% | 100.000000% |

*assuming election to convert to payout and subject to the option provided under Article 9(e) as provided in that certain July 16, 1996 Farmout Agreement between Meridian Oil Company and McMurry Oil Company and further subject to the terms of said agreement.

1

2. Below 200 feet below the stratigraphic equivalent of 9,731 feet being total depth in the Pinedale 1-14 well located in the NENE of Section 14-T31N-R109W.

| Party | Interest |
|---|---|
| McMurry Energy Company | 6.93000% |
| Nerd Energy, Inc. | 3.46500% |
| Fort Collins Consolidated Royalties, Inc. | 3.32500 % |
| Williams Production Rocky Mountain Company | .28000% |
| ST Oil Company** | 2.75000%** |
| III Exploration Company ** | 8.25000%** |
| Ultra Resources, Inc. | 63.75000% |
| Lance Oil & Gas Company, Inc. | 11.25000% |
| Total | 100.00000% |

**The interest of ST Oil Company and III Exploration is subject to a produce to earn requirement as provided in that certain Leasehold Exchange Agreement dated January 26, 1999, as amended, between ST Oil Company, etal and McMurry Oil Company, et al. If such interest is not productive as provided in said agreement, then these interests will be reallocated to McMurry Energy Company, Nerd Energy, Inc., Fort Collins Consolidated Royalties, Inc. and Williams Production Rocky Mountain Company.

C.   Township 31 North, Range 109 West, 6th P.M.
Section 13: NE, SW

1. Surface down to 200 feet below the stratigraphic equivalent of 9,731 feet being total depth in the Pinedale 1-14 well located in the NENE of Section 14-T31N-R109W.

| Party | Interest |
|---|---|
| McMurry Energy Company | 34.77375% |
| Nerd Energy, Inc. | 17.386875% |
| Fort Collins Consolidated Royalties, Inc. | 16.684375% |
| Williams Production Rocky Mountain Company | 1.405000% |
| ST Oil Company | 2.75000% |
| III Exploration Company | 8.25000% |
| Ultra Resources, Inc. | 15.937500% |
| Lance Oil & Gas Company, Inc. | 2.812500% |
| Total | 100.000000% |

2. Below 200 feet below the stratigraphic equivalent of 9,731 feet being total depth in the Pinedale 1-14 well located in the NENE of Section 14-T31N-R109W.

| Party | Interest |
|---|---|
| McMurry Energy Company | 6.93000% |
| Nerd Energy, Inc. | 3.46500% |
| Fort Collins Consolidated Royalties, Inc. | 3.32500 % |
| Williams Production Rocky Mountain Company | .28000% |
| ST Oil Company** | 2.75000%** |
| III Exploration Company ** | 8.25000%** |
| Ultra Resources, Inc. | 63.75000% |
| Lance Oil & Gas Company, Inc. | 11.25000% |
| Total | 100.00000% |

**The interest of ST Oil Company and III Exploration is subject to a produce to earn requirement as provided in that certain Leasehold Exchange Agreement dated January 26, 1999, as amended, between St Oil Company, etal and McMurry Oil Company, et al. If such interest is not productive as provided in said agreement, then these interests will be reallocated to McMurry Energy Company, Nerd Energy, Inc., Fort Collins Consolidated Royalties, Inc. and Williams Production Rocky Mountain Company.

D.   Township 31 North, Range 109 West, 6th P.M.
Section 2: SW, but only insofar as production from the New Fork Unit 13-2A wellbore

2

Exhibit "B"

Attached to and made a part of that certain Operating Agreement dated October 25, 2001 by and between McMurry Energy Company, as Operator and Ultra Resources, Inc., et al as Non-Operator(s).

There is no Exhibit "B" to this Operating Agreement.

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

EXHIBIT " C "

Attached to and made a part of that certain Operating Agreement dated October 25, 2001 by and between McMurry Energy Company, as Operator and
Ultra Resources, Inc., et al as Non-Operator(s).

# ACCOUNTING PROCEDURE

# JOINT OPERATIONS

## 1. GENERAL PROVISIONS

1.   **Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure
is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and
maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint
Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct
supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating
capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other
professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and
problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as
most recently recommended by the Council or Petroleum Accountants Societies.

2.   **Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint
Account for the preceding month. Such bills will be accompanied by statements which identify the authority for
expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and
expense except that items of Controllable Material and unusual charges and credits shall be separately identified and
fully described in detail.

3.   **Advances and Payments by Non-Operators**

A.   Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their
share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the
billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust
each monthly billing to reflect advances received from the Non-Operators.

B.   Each Non-Operator shall pay its proportion of all bills within thirty (30)  days after receipt. If payment is not made
within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at ___Wells Fargo Bank, N.A., Denver, Colorado___
on the first day of the month in which delinquency occurs plus 1% or the
maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located,
whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid
amounts.

4.   **Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof;
provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar* year shall
conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar
year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes
claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same
prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of
Controllable Material as provided for in Section V.

**COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.**

- 1 -

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

5.   **Audits**

   A.   A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section 1. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

   B.   The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6.   **Approval By Non-Operators**

   Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.   **Ecological and Environmental**

   Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2.   **Rentals and Royalties**

   Lease rentals and royalties paid by Operator for the Joint Operations.

3.   **Labor**

   A.   (1)   Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

      (2)   Salaries of First level Supervisors in the field.

      (3)   Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

      (4)   Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

   B.   Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

   C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

   D.   Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

4.   **Employee Benefits**

   Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



5.  **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6.  **Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A.  If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B.  If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C.  In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7.  **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8.  **Equipment and Facilities Furnished By Operator**

A.  Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed _____ ten _____ percent ( _____ 10 _____ %) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.  In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9.  **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10.  **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11.  **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

- 3 -

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

—COPAS—

12. **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13. **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14. **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15. **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

### III. OVERHEAD

1. **Overhead - Drilling and Producing Operations**

    i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

    ( X ) Fixed Rate Basis, Paragraph 1A, or
    (   ) Percentage Basis, Paragraph 1B

    Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

    ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

    (   ) shall be covered by the overhead rates, or
    ( X ) shall not be covered by the overhead rates.

    Shall be covered by the overhead rates but
    iii. The salaries, wages and Personal Expenses of Technical Employees / costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property shall not be covered by the overhead rates.

    A. **Overhead - Fixed Rate Basis**

    (1) Operator shall charge the Joint Account at the following rates per well per month:

    Drilling Well Rate $_____7500.00_____
       (Prorated for less than a full month)

    Producing Well Rate $____750.00_____

    (2) Application of Overhead - Fixed Rate Basis shall be as follows:

    (a) Drilling Well Rate

    (1) Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b) Producing Well Rates

(1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

2.   Overhead - Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

Account for overhead based on the following rates for any Major Construction project in excess of $ _25,000.00_____

A.    _____5_____ % of first $100,000 or total cost if less, plus

B.    _____3_____ % of costs in excess of $100,000 but less than $1,000,000, plus

C.    _____2_____ % of costs in excess of $1,000,000

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3.    **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A.    _____5_____ % of total costs through $100,000, plus

B.    _____3_____ % of total costs in excess of $100,000 but less than $1,000,000, plus

C.    _____2_____ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4.    **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

### IV.    PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS *

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property, provide, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1.    **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2.    **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A.    New Material (Condition A)

(1)    Tubular Goods Other than Line Pipe

(a)    Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

(b)    For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000

* Operator shall account for material transfers and purchases in accordance with COPAS interpretation 23 or the pricing procedures most recently recommended by COPAS.

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



COPAS

pound Oil Field Haulers Association interstate truck rate shall be used.

(c) Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

(d) Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

(2) Line Pipe

(a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(b) Line Pipe movements (except size 24 inch OD) and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(c) Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

(d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

(3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).

B.   Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

At seventy-five percent (75%) of current new price, as determined by Paragraph A.

(2) Material used on and moved from the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

(b) At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material

(3) Material not used on and moved from the Joint Property

At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C.   Other Used Material

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

(2)  Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

    (a)  Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight.   Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

    (b)  Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)  Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.  Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.  Pricing Conditions

(1)  Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents  (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2)  Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.  Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material.  Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4.  Warranty of Material Furnished By Operator

Operator does not warrant the Material furnished.   In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.  Periodic Inventories, Notice and Representation

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.  Reconciliation and Adjustment of Inventories

Adjustments to the Joint Account resulting from the reconciliation of   a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.   **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.   **Expense of Conducting Inventories**

A.   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.   The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

Attached to and made a part of that certain Operating Agreement dated October 25, 2001 by and between McMurry Energy Company, as Operator and Ultra Resources, Inc., et al as Non-Operator(s).

## EXHIBIT "D"

### INSURANCE

1.  Operator shall at all times while performing under this Agreement carry and charge to the Joint Account the following minimum amounts of insurance for the benefit of the parties hereto.

    A.  Workmen's Compensation, including where applicable, Longshoremen's and Harbor Workers Compensation Act coverage ( extended to include Outer Continental Shelf and Maritime Coverage) in accordance with Federal Law and the Laws of the State in which operations will be conducted and/or other applicable jurisdiction.

    B.  General Liability

    | | |
    |---|---|
    | Each Occurrence | $1,000,000 |
    | Personal & ADV Injury | $1,000,000 |
    | General Aggregate | $2,000,000 |

    C.  Excess Liability

    | | |
    |---|---|
    | Each Occurrence | $5,000,000 |
    | Aggregate | $5,000,000 |

    D.  Automobile Liability

    | | |
    |---|---|
    | Combined Single Unit | $1,000,000 |

    E.  Control of Well. Control of well, seepage, pollution, cleanup and containment and cost of redrill with a minimum combined single limit of $5,000,000.00 per occurrence.

2.  No other instance will be required other than that set forth above nor will premiums thereon be charged to the joint account. Each Non-Operator may elect to be excluded from the Control of Well insurance and any additional coverage for umbrella liability whose limits exceed coverages for 1A. through 1D. above, as provided for above and its share of the premiums therefore, provided any such party shall give Operator written notice, prior to the commencement of any well drilled hereunder, that it elects to be excluded from said coverages and simultaneously provides Operator with a copy of its certificate of insurance evidencing that said coverage is in full force and effect and in the minimum amount as above set forth.

3.  The insurance provided for herein for the benefit of the Joint Account may provide for certain deductibles to be borne by the insured parties. In the event a claim is made by the Operator on behalf of the Joint Account, or on behalf of the parties participating in the Control of Well insurance, carried for the benefit of said parties, and the insurance proceeds are subject to reduction as a result of a deductible provision, proceeds are subject to reduction as a result of a deductible provision, said deductible amount shall be a direct charge to the Joint Account, or if less than all parties have elected to participate in the control of well insurance provided by the Operator, than any deductible from Control of Well proceeds shall be borne proportionately by the parties participating in said Control of Well insurance.

4.  Operator will require that each Contractor and Subcontractor carry and maintain insurance and provide evidence of same at their sole expense in amounts deemed necessary to cover risk, inherent to the work and services performed, but no less than $1,000,000 in the categories set forth above in 1(A) - (D); and where permitted by law, Contractor's underwriter shall waive subrogation against Non-Operators, and make Non-Operators additional insureds, except for General Liability. Contractors engaged in maritime operations for utilizing vessels shall carry hull and machinery and P&I coverage with customary endorsements in amounts deemed appropriate by Operator.

5.  Operator shall notify Non-Operators as soon as practicable after the occurrence of any accident involving either damage to property or injuries to or death of persons.

## END OF EXHIBIT "D"

Exhibit "E"

Attached to and made a part of that certain Operating Agreement dated October 25, 2001 by and between McMurry Energy Company, as Operator and Ultra Resources, Inc., et al as Non-Operator(s).

Gas Balancing Agreement

ARTICLE I
Definitions

1.01     For the purposes of this Agreement, the terms set forth below shall have the meanings herein ascribed to them.

(a)     "Balance" is the condition existing when a Party has disposed of a cumulative volume of Gas from a Well which is equal to such Party's Percentage Ownership of the total cumulative volume of Gas disposed of by all Parties from such Well. For purposes of Balancing, references herein to price, value and volume shall be adjusted or calculated on a Btu basis.

(b)     "Btu" is one British thermal unit, which is the amount of heat required to raise the temperature of one pound of water one degree Fahrenheit from 58.5° Fahrenheit to 59.5° Fahrenheit, at 14.73 pounds per square inch absolute. The term "MMBtu" refers to one million (1,000,000) Btu's.

(c)     "FERC" refers to the Federal Energy Regulatory Commission, or any similar or successor agency, state or federal.

(d)     "Gas" includes all hydrocarbons produced or producible from a Well, whether from a Well classified as an oil Well or gas Well by the regulatory agency having jurisdiction in such matters, which are or may be made available at the Measurement Point for sale or separate disposition by the Parties, excluding oil, condensate or other liquids separated upstream from the Measurement Point. "Gas" does not include gas used for joint operations, or gas which is vented or lost, prior to delivery at the Measurement Point. References herein to the right to "dispose of" Gas or Gas "disposed of" includes all methods of disposition of Gas, including taking in kind, delivering in kind to a Lessor, sales to a Party or third party or an affiliate, or gas used by a Party for purposes other than joint operations.

(e)     "Imbalance" refers to either the Overproduction of an Overproduced Party or the Underproduction of an Underproduced Party, as applicable.

(f)     "Make-up Gas" refers to that incremental volume of Gas, up to but not exceeding forty percent (40%) of the Percentage Ownership of an Overproduced Party in the Gas which can be produced from a Well which an Underproduced Party is entitled to dispose of in accordance with this Agreement in order to make up its Imbalance.

(g)     "Mcf" means the quantity of Gas occupying a volume of one thousand (1,000) cubic feet at a temperature of sixty degrees Fahrenheit (60°F) and a pressure of fourteen and seventy-three hundredths pounds per square inch absolute (14.73 psia).

(h)     "Measurement Point" refers to the outlet side of the jointly owned production facilities, or such other point mutually agreeable where Gas from a Well is measured after the separation of oil, condensate or other liquids.

(i)     "Operator" refers to Operator hereunder or to its successor, as designated under the terms of the Operating Agreement.

(j)     "Overproduced" is the condition existing when a Party has disposed of a greater cumulative volume of Gas from a Well than its Percentage Ownership of the total cumulative volume of Gas disposed of by all Parties from such Well.

(k)     "Party" means any party subject to the Operating Agreement. "Parties" means all parties subject to the Operating Agreement.

(l)     The "Percentage Ownership" of each Party is equal to that Party's percentage or fractional interest in the Well, as determined under the terms of the Operating Agreement.

Exhibit "E"                                                                    Page 2

(m)   "Underproduced" is the condition existing when a Party has disposed of a lesser cumulative volume of Gas from a Well than its Percentage Ownership of the total cumulative volume of Gas disposed of by all Parties from such Well.

(n)   The terms "Underproduction" and "Overproduction" refer to that lesser or greater incremental volume of Gas which a Party would have disposed of from a Well, on a monthly or cumulative basis, if it had disposed of its Percentage Ownership of Gas from that Well.

(o)   "Well" means a well drilled on the Contract Area covered by the Operating Agreement and capable of producing Gas.

1.02   Unless the context clearly indicates to the contrary, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

ARTICLE II
Scope and Term of Agreement

2.01   This Agreement establishes a separate gas balancing agreement for each Well covered by the Operating Agreement t the same extent as if a separate Gas Balancing Agreement had been executed for each such Well.

2.02   This Agreement shall terminate, separately as to each Well, ~~as to each Well~~ ~~when production from such Well permanently ceases~~ when production from such Well permanently ceases and the Gas accounts for such Well are brought into Balance pursuant to this Agreement, and the operating agreement to which this Agreement is attached terminates.

ARTICLE III
Right to Produce and Ownership of Gas

3.01   Subject to the rights of an Underproduced Party to produce and dispose of Make-up Gas pursuant to this Agreement, each Party shall own and be entitled to produce and dispose of its Percentage Ownership of gas which can be produced from a Well. During any month when a Party does not dispose of its entire Percentage Ownership of such Gas, the other Parties shall be entitled to produce and dispose of all or any portion of such Gas; provided, that to the extent such Parties desire to dispose of more Gas than is available, they shall share in such Gas in the proportion that each such Party's Percentage Ownership bears to the combined Percentage Ownership of all Parties desiring to dispose of such Gas.

3.02   As between the Parties hereto, each Party shall own and be entitled to the Gas disposed of by such Party for its sole account, and the proceeds thereof, including constituents contained therein that are recovered downstream from the Measurement Point.  If at any time, and from time to time, a Party is Underproduced with respect to a Well, ~~XXXXXXXXXXXXXXXXX~~ ~~XXXXXXXXXXXXXXXXXXX XXXXXXXXX XXXXXX XX XXXXXXX XX XXXXXXX XX XXXXXXXX XXX~~ ~~XXXXX XXXXXX XXX XXXXXXXXX XXXX~~ the Underproduced Party shall be credited with a volume of gas equal to its Underproduction.

ARTICLE IV
Make-Up Gas

4.01   In order to make up an Imbalance, each Underproduced Party in a Well shall have the right, after thirty (30) days written notice to the Operator, to produce and dispose of Make-up Gas, subject to the following rules:

(a)   An Overproduced Party shall not be required to furnish Make-Up Gas unless the Underproduced Party is first taking or disposing of its full percentage ownership of Gas from a Well; and

(b)   An Overproduced Party shall not be required under any circumstances to reduce its takes to less than its Percentage Ownership of Gas which can be produced from a Well during the months of January, February, November and December of a calendar year; and

(c)   An Overproduced Party shall not be required under any circumstances to reduce its takes to less than sixty percent (60%) of such Overproduced Party's Percentage Ownership of Gas which can be produced from a Well; and

(d)     If there is more than one Overproduced Party, the Make-up Gas will be taken from the Overproduced Parties in the proportion that each Overproduced Party's Overproduction bears to the total Overproduction of all Overproduced Parties in that Well, which proportion shall be determined as of the 1st day of the preceding month; and

(e)     If there is more than one Underproduced Party who desires and is able to dispose of Make-up Gas in a month, each Underproduced Party will share in the Make-up Gas in the proportion which its Percentage in a well bears to the total Percentage Ownership of all Underproduced Parties in that Well disposing of Make-up gas that month.

4.02     The provisions of this Article IV shall constitute an Underproduced Party's exclusive rights and an Overproduced Party's exclusive obligations with regard to the right of an Underproduced Party to require an Overproduced Party to furnish Make-up Gas.

4.03     Nothing herein shall be construed to deny any Party the right from time to time to produce and deliver its full Percentage Ownership of Gas in a Well for the purpose of conducting deliverability tests pursuant to its gas purchase contracts.

ARTICLE V
Balancing of Gas Accounts

5.01     The Operator shall have the right of controlling production and deliveries of Gas and administering the provisions of this Agreement. The Operator shall use its best efforts to cause Gas to be delivered at the Measurement Point in such manner and at such rates as may be required, from time to time, to give effect to the intent that any imbalances shall be brought into Balance in accordance with the provisions hereof. The Operator shall only be liable for its failure to make deliveries of Gas in accordance with the terms of this Agreement if such failure is due to its gross negligence or willful misconduct.

5.02     The Operator will maintain a separate Gas account for each Party and Well. On or before each January 20, April 20, July 20, and October 20, the Operator will furnish each Party a report showing the total Mcf of gas produced from each Well, the Mcf used in joint operations, or which was vented or lost, the Mcf of Gas disposed of by each Party, each Party's Overproduction or Underproduction for the preceding calendar quarter, and the cumulative imbalance of all Parties in each Well. In the event that production from each Well is not separately measured, then the Operator will allocate production to each Well on the basis of periodic tests or such other methods as are commonly used and accepted in the industry. The imbalance of an Underproduced Party shall be made up on a month-to-month basis and in the order of accrual; i.e., any Gas taken by any Underproduced Party over and above the monthly amount attributable to its Percentage Ownership shall be credited against and offset its first Underproduction from time to time.

5.03     Each Party shall retain all data, information and records pertaining to the Gas taken and disposed of by such Party in a Well, including, but not limited to, records pertaining to the volumes of Gas disposed of, the gross and net proceeds received from the disposition of such Gas, and the information utilized to adjust volumes and prices on a Btu basis, for a period expiring three (3) years after the termination of this Agreement as to such Well.

5.04     During the term of this Agreement, each Party shall have the right to request information from and to audit the records of the Operator and any other Party as to all matters concerning volumes, Btu adjustments, and disposition of Gas from a Well. These rights for each Well shall extend until three (3) years after the expiration of the Agreement as to that Well. Any audit shall be conducted at the expense of the Party or Parties desiring such audit, and shall be conducted, after reasonable notice, during normal business hours in the office of the Party whose records are being audited. If more than one Party desires to audit the records of another Party, then all such Parties shall cooperate with each other in order that only one audit shall be conducted in any twelve (12) month period.

ARTICLE VI
Cash Settlement of Imbalances

6.01     When production from a Well permanently ceases, the Operator shall render its final account of the cumulative imbalance of all Parties for that Well within sixty (60) days after receiving the information requested as hereafter provided. Within thirty (30) days of Operator's request, each Overproduced Party shall provide information to Operator sufficient for the preparation of such statements including, but not limited to the net price received for its Overproduction and each Underproduced Party shall submit to Operator such data and information evidencing its payment of all royalties, overriding royalties, production burdens and

taxes on its Underproduction which it was obligated to pay. Each Overproduced Party shall account to and pay each Underproduced Party within sixty (60) days of Operator's final account a sum of money equal to the net price on the Underproduction which an Underproduced Party was entitled to receive from an Overproduced Party. All past due payments due Underproduced Parties shall bear interest at the prime rate of interest in effect from time to time of Chemical Bank, N.Y. from date due until date paid. Net price for cash settlements herein shall be determined in accordance with Paragraph 6.02.

6.02     The net price for cash settlements (without interest) under this Article VI shall be the price actually received by the Overproduced Party for the sale of the Overproduction at the time the Overproduction accrued less production, severance and other similar taxes, fees pg or similar levies thereon and less royalties actually paid by an Overproduced Party attributable to the Underproduction of an Underproduced Party.

6.03     If any portion of the price which is to be paid to the Underproduced Party is subject to refund under order, rule or regulation of the FERC, then the Overproduced Party shall withhold the increment of price subject to refund until the price is fully approved, unless the Underproduced Party furnishes a corporate undertaking satisfactory to the Overproduced Party guaranteeing the return of the increment in price attributable to such refund, including interest, if any, which is required to be paid with such refund. In addition, if FERC or any other governmental agency having jurisdiction requires that an Overproduced Party make a refund with respect to any portion of a price used to make payment under this Article VI, then the Underproduced Party(ies) shall reimburse the Overproduced Party for such refund, including any interest required to be paid with respect thereto. This Paragraph 6.03 shall survive the termination of this Agreement until the period has passed for which a refund may be required.

## ARTICLE VII
### Costs and Ownership of Liquids

All operating risks, expenses and liabilities shall be borne and paid by the Parties in accordance with the provisions of the Operating Agreement, or other Agreement, rule or order if there is not an Operating Agreement, regardless of whether the Gas is being taken or disposed of from a Well at any given time in proportion to the Percentage Ownership of all Parties in that Well. Liquid hydrocarbons of a Well separated from the Gas prior to delivery at the Measurement Point shall be owned by all Parties in accordance with their Percentage Ownership in the Well, and each of the Parties shall be entitled to own and market their liquid hydrocarbons separated prior to the Measurement Point in accordance with its Percentage Ownership in the Well, irrespective of the fact that one or more of the Parties may not be disposing of Gas from the Well.

## ARTICLE VIII
### Indemnity

Each Party hereby indemnifies and agrees to hold the other parties harmless from all claims which may be asserted by any third party arising out of the operation of this Agreement and the performance by the indemnifying Party of its obligations hereunder. Such indemnity shall extend to and include all costs of investigation and defense (including reasonable attorneys fees), and all judgments and damages incurred or sustained, as a result of any such claim.

## ARTICLE IX
### Payment of Lease Burdens

Unless otherwise required by provisions of a lease, agreement, or statute, rule, regulation, or order of any governmental authority having jurisdiction, and regardless of who is actually taking or disposing of Gas from a Well, each Party shall be responsible for and shall pay or cause to be paid any and all royalties, overriding royalties, production payments and similar encumbrances on production due on its full Percentage Ownership of Gas production from a Well and shall hold the other Parties free from any liability therefor. The Party or Parties actually taking and disposing of Gas from a Well shall be responsible for and shall pay all production, severance or similar taxes, fees or levies on such production.

taxes on its Underproduction which it was obligated to pay. Each Overproduced Party shall account to and pay each Underproduced Party within sixty (60) days of Operator's final account a sum of money equal to the net price on the Underproduction which an Underproduced Party was entitled to receive from an Overproduced Party. All past due payments due Underproduced Parties shall bear interest at the prime rate of interest in effect from time to time of Chemical Bank, N.Y. from date due until date paid. Net price for cash settlements herein shall be determined in accordance with Paragraph 6.02.

6.02     The net price for cash settlements (without interest) under this Article VI shall be the price actually received by the Overproduced Party for the sale of the Overproduction at the time the Overproduction accrued less production, severance and other similar taxes, fees or levies thereon and less royalties actually paid by an Overproduced Party attributable to the Underproduction of an Underproduced Party.

6.03     If any portion of the price which is to be paid to the Underproduced Party is subject to refund under order, rule or regulation of the FERC, then the Overproduced Party shall withhold the increment of price subject to refund until the price is fully approved, unless the Underproduced Party furnishes a corporate undertaking satisfactory to the Overproduced Party guaranteeing the return of the increment in price attributable to such refund, including interest, if any, which is required to be paid with such refund. In addition, if FERC or any other governmental agency having jurisdiction requires that an Overproduced Party make a refund with respect to any portion of a price used to make payment under this Article VI, then the Underproduced Party(ies) shall reimburse the Overproduced Party for such refund, including any interest required to be paid with respect thereto. This Paragraph 6.03 shall survive the termination of this Agreement until the period has passed for which a refund may be required.

## ARTICLE VII
### Costs and Ownership of Liquids

All operating risks, expenses and liabilities shall be borne and paid by the Parties in accordance with the provisions of the Operating Agreement, or other Agreement, rule or order if there is not an Operating Agreement, regardless of whether the Gas is being taken or disposed of from a Well at any given time in proportion to the Percentage Ownership of all Parties in that Well. Liquid hydrocarbons of a Well separated from the Gas prior to delivery at the Measurement Point shall be owned by all Parties in accordance with their Percentage Ownership in the Well, and each of the Parties shall be entitled to own and market their liquid hydrocarbons separated prior to the Measurement Point in accordance with its Percentage Ownership in the Well, irrespective of the fact that one or more of the Parties may not be disposing of Gas from the Well.

## ARTICLE VIII
### Indemnity

Each Party hereby indemnifies and agrees to hold the other parties harmless from all claims which may be asserted by any third party arising out of the operation of this Agreement and the performance by the indemnifying Party of its obligations hereunder. Such indemnity shall extend to and include all costs of investigation and defense (including reasonable attorneys fees), and all judgments and damages incurred or sustained, as a result of any such claim.

## ARTICLE IX
### Payment of Lease Burdens

Unless otherwise required by provisions of a lease, agreement, or statute, rule, regulation, or order of any governmental authority having jurisdiction, and regardless of who is actually taking or disposing of Gas from a Well, each Party shall be responsible for and shall pay or cause to be paid any and all royalties, overriding royalties, production payments and similar encumbrances on production due on its full Percentage Ownership of Gas production from a Well and shall hold the other Parties free from any liability therefor. The Party or Parties actually taking and disposing of Gas from a Well shall be responsible for and shall pay all production, severance or similar taxes, fees or levies on such production.

Exhibit "E"

## ARTICLE X
### Notices

Any notices or other communications required or permitted hereunder shall be in writing and shall be deemed given only when received by the party to whom the same is directed at the addresses and in the manner then provided under the Operating Agreement.

c:bah:ex-o-on.doc

Exhibit "F"

Attached to and made a part of that certain Operating Agreement dated October 25, 2001 by and between McMurry Energy Company, as Operator and Ultra Resources, Inc., et al as Non-Operator(s).

## NON-DISCRIMINATION AND EQUAL EMPLOYMENT OPPORTUNITY

In the performance of this Agreement, Operator shall not engage in any conduct or practice which violates any applicable law, order or regulation prohibiting discrimination against any person by reason of race, religion, color, sex, national origin or age. Operator, unless exempt therefrom, further agrees to comply fully with the non-discrimination provisions of Section 202 of Executive Order No. 11246 (30 C.F.R. 12319), which are hereby included in this Agreement as full as if copies herein.

END OF EXHIBIT "F"

Final

Exhibit "H"

Attached to and made a part of that certain Operating Agreement dated October 25, 2001 by and between McMurry Energy Company, as Operator and Ultra Resources. Inc., et al as Non-Operator(s).

Agreement for the Allocation of Costs and Production
Sublette County, Wyoming

WHEREAS, the signatory parties to the operating agreement to which this Exhibit "H" is attached recognize that the ownership in the Contract Area is subject to varying interests of ownership as to certain depths; and

WHEREAS, it is the desire of the parties that the costs and production from any well proposed to be drilled to a depth that includes the depth where such interests change down to the top of the Ericson formation (hereafter referred to as a "Well") be shared and allocated as set forth in this Exhibit "H", subject to each parties individual elections of whether to participate in the drilling of any such Well or its completion or to elect to be a Non Consenting Party as provided in the operating agreement to which this Exhibit "H" is attached. This Exhibit "H" shall only apply to those Wells proposed to be drilled from the depth where such interest change occurs down to the top of the Ericson formation identified as the stratigraphic equivalent of 13,065 feet in the Wagon Wheel No. 1 well located in the NW/4 of Section 5, Township 30 North, Range 108 West, Sublette, County, Wyoming.

NOW THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

1.   Cost and Expense
The entire cost and expense involved in the drilling, testing, completing, equipping and operating the Well either as a producer or plugged and abandoned as a dry hole, shall be borne by the working interest owners in accordance with the provisions of this Exhibit "H" and the operating agreement to which it is attached, according to their respective ownership in the Shallow Formation and the Deep Formation as set forth on Exhibit "A" of the operating agreement.

As used herein, the Shallow Formation is the stratigraphic interval from the surface of the earth down to the stratigraphic equivalent of the depth earned and the Deep Formation is that interval below the Shallow Formation down to the Top of the Ericson formation, all as set forth on Exhibit "A" of the operating agreement. In the event there are additional stratigraphic intervals such interests shall be incorporated in like manner as provided herein for the Shallow Formations and the Deep Formations.

2. Initial Cost and Expense From Commencement.
The initial cost and expense of the Well from commencement of operations from surface down to the proposed total depth, shall be borne (and any drilling cash calls made) by the Consenting working interest owners in proportion to their interest in the Shallow Formation and the Deep Formation determined as a percentage of the applicable footage from the Top of the Overpressure down to the proposed total depth of the Well on the lands upon which it is located, provided that the total depth of the Well does not go below the top of the Ericson Formation. For purposes of this Exhibit "H", the Top of Overpressure is agreed to exist at the following depths for the applicable lands identified as Blocks A, B, C, D and E under that certain July 16, 1996 Farmout Agreement between Meridian Oil Company and McMurry Oil Company to which the Contract Area is subjected thereto as follows:

| Block | Depth of Top of Overpressure |
|-------|------------------------------|
| Block A | 7,300 feet |
| Block B | 8,000 feet |
| Block C | 8,400 feet |
| Block D | 8,300 feet |
| Block E | 8,200 feet |

Any well proposed to be drilled below the top of the Ericson Formation will require a separate cost and production sharing agreement to be agreed to by the signatory parties hereto.

3.   Allocation of Actual Costs and Expense Associated to Plug and Abandon as a Dry Hole.
In the event the Well is drilled and logged and plugged and abandoned as a dry hole, the cost and expense incurred from commencement of the Well (including all cost chargeable under the applicable AFE for the Well) through plugging and abandoning shall be borne by the Consenting working interest owners in the Shallow Formation and in the Deep Formation in the percentages as provided in Article 2.

4. Completion of the Well in the Shallow Formation, the Deep Formation or Both Formations.
In the event the Well is to be completed for production from either or both the Shallow Formation and the Deep Formation, all costs of drilling, testing, logging, completing and equipping shall be recalculated and borne by the Shallow Formation and the Deep Formation in accordance with the provisions of this Article 4. All such costs of the Well (including cash calls for the completion) and all production from the Well shall be borne by or accrue to the Consenting working interest owners in the Shallow Formation and the Deep Formation based on a net pay calculation as follows:

a) The net pay shall be calculated for both the Shallow Formation and the Deep Formation.  Net Pay shall be calculated and defined by taking the number of feet greater than eight percent (8%) density porosity (based on 2.65 grams per cubic centimeter grain density) and coincident with a Gamma Ray response less than 75 API units as taken from the open hole logs on the Well unless the Consenting Parties mutually agree to an equivalent evaluation criteria based on the logs and data obtained from the Well.  All cost and expense incurred in the commencement, drilling, testing, completing and equipping of the Well shall be borne and any production from the Well shall be shared in proportion to the Net Pay present in the Shallow Formation and the Deep Formation as each bears to the total Net Pay calculated in the Well. Thereafter, the initial costs borne pursuant to Article 21 shall be recalculated and borne by the Consenting working interest owners electing to complete the Well in their respective percentages as set forth in this Article 3.

b) In the event Net Pay cannot be calculated in the Well because of either lack of open hole logs or poor quality open hole logs, the costs applicable hereto and the production from the Well shall be borne or accrue, without the agreement of the parties as to a mutually agreeable alternative, based on the percentage of the perforated interval in the Shallow Formation and the Deep Formation as each bears to the total perforated intervals in the Well.

c) In the event that there is a disagreement among the parties over identification of the depth of the stratigraphic equivalent in any Well as used in the net pay calculation or a disagreement over the net pay calculation itself, then the disagreement shall be referred to a mutually agreed upon geologist for final determination. Cost for this dispute resolution shall be borne by the parties pursuant to the Joint Operating Agreement.

5. General Operating and Maintenance Costs and Workover Costs.
The costs of general producing operations (including producing administrative overhead) and workover costs shall be borne proportionately by the Shallow Formation and the Deep Formation in the same percentages to which total Well costs are borne and production is being allocated as provided in Article 4.

6. Non Consenting Parties to the Drilling of a Well.
In the event any party elects to be a Non Consenting Party to the drilling of a Well, the applicable non consent interests shall be determined in accordance with Articles 2 and 3 and the Consenting Parties shall make their proportionate elections as to such non consent interest based on the interest owned by the Consenting Parties and the Non Consenting Parties in the Shallow Formation and the Deep Formation.

7. Non Consenting Parties to the Completion of a Well.
In the event any party consents to the drilling of the Well but elects to be a Non Consenting Party as to its completion as provided in Article VII.D.2 to the operating agreement, such non consent election shall be based on such parties Non-Consent interest as determined pursuant to Article 4 above based on the Non Consenting Party's interest in the Shallow Formation and the Deep Formation. Notwithstanding the change of interests as provided in Article 4, no party electing to be a Non Consenting Party in the completion of a Well shall be responsible for any more or less of the costs for drilling the Well than its share as provided in Article 2, however the Non Consenting interests available shall be determined in accordance with Article 4 and the costs to be recouped due to any non consent interest shall be those actual costs incurred or which would have been incurred as determined by Articles 2 and 4, whichever are applicable. Any party which elects to acquire its share of such Non Consenting interest shall be responsible for its proportionate share of any costs attributable to such non consent interest as determined pursuant to Article 4. No party electing to be a Non Consenting Party under Article VII.D.2 of the operating agreement shall be entitled to incur additional expense or obtain a reimbursement of the costs it incurred under Article 2, except as a result of Article VI.B.2 to the operating agreement to which this Exhibit "H" is attached.

8. Miscellaneous Provisions.

A.   In the event that any provisions of this agreement are in conflict with the provisions of the applicable operating agreement for the Well, then the provisions of such operating agreement shall be modified to the minimum extent necessary to eliminate such conflict and the provisions of this agreement shall prevail.

B.   Nothing contained herein shall bind any party hereto to participate in the Well or its completion unless and until such party elects to be a Consenting or Non Consenting Party pursuant to its election under the Authority for Expenditure ("AFE") for the Well and the operating agreement to which this Exhibit "H" is attached. Upon such party's election, the terms and provisions of this Exhibit "H" shall be binding on such party whether such party elects to be a Consenting or a Non Consenting Party.

C.  Notwithstanding anything to the contrary contained in this Exhibit "H", in the event any party to the operating agreement to which this exhibit is attached owns a like interest in the Shallow Formation and the Deep Formation, nothing contained herein shall require such party to pay a greater cost or receive any less production than that which would be due as determined for such party as if this agreement were not in effect.

D.  Upon the written request of any party to this agreement, the parties hereto do agree to meet at least annually to evaluate whether the cost and production allocation set forth herein is equitable to the parties hereto and to evaluate and negotiate in good faith any changes, modifications or amendments to this Exhibit "H", provided however that no such changes or modifications shall become effective until accepted in writing by all the working interest owners to this agreement.

E.  An election to complete any Well shall be made and shall be treated as an election to complete the Net Pay in the entire Well and no party shall have the right or be entitled to make individual elections to complete or not complete individual zones in the Well.

9. Stipulation of Interest
    The parties hereto agree to execute and deliver a Stipulation of Interest for the purpose of providing notice as to the actual interests of any Well which is affected by this agreement.

End of Exhibit "H"

A+B
STSC

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE XVI.

MISCELLANEOUS

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes

IN WITNESS WHEREOF, this agreement shall be effective as of this 25th day of October, 2001.

McMurry Energy Company_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and with the exception listed below, is identical to the AAPL Form 610-1982 Model Form Operating Agreement, as published in diskette form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those in Articles IV.A. and B.,   VI. VII.C. B. F. VIII. A. B., X. V.B., XIV.C

OPERATOR

McMurry Energy Company


_____

Steve Van-Hook, Attorney-in-Fact

NON-OPERATORS

| | |
|---|---|
| Nerd Energy, Inc. | Williams Production Rocky Mountain Company |
| By:_____ | By:_____ |
| Title:_____ | Title:_____ |
| Fort Collins Consolidated Royalties, Inc. | Ultra Resources, Inc. |
| By:_____ | By:_____ |
| Title: | Title:_____ |
| Lance Oil & Gas Company, Inc. | ST Oil Company |
| By: J. BURTON JONES | By:_____ |
| Title: V.P. Business Development & Land | Title:_____ |
| III Exploration Company. | |
| By:_____ | By:_____ |
| Title: | Title:_____ |

1. Surface down to 200 feet below the stratigraphic equivalent of 11,877 feet being total depth in the New Fork Unit 13-2A well located in the SWSW of Section 2-T31N-R109W.

| Party | *Before Payout of the NFU 13-2A well | *After Payout of the NFU 13-2A well |
|---|---|---|
| McMurry Energy Company | 49.50000% | 40.218750% |
| Nerd Energy, Inc. | 24.75000% | 20.109375% |
| Fort Collins Consolidated Royalties, Inc. | 23.75000% | 19.296875% |
| Williams Production Rocky Mountain Company | 2.00000% | 1.625000% |
| Ultra Resources, Inc.* | 0.00000% | 15.937500% |
| Lance Oil & Gas Company, Inc.* | 0.00000% | 2.812500% |
| Total | 100.00000% | 100.000000% |

*assuming election to convert to payout as provided in that certain July 16, 1996 Farmout Agreement between Meridian Oil Company and McMurry Oil Company and further subject to the terms of said agreement.

   E.   Township 31 North, Range 109 West, 6th P.M.
        Section 2: SW, but excluding the New Fork Unit 13-2A wellbore

1. Surface down to 200 feet below the stratigraphic equivalent of 11,877 feet being total depth in the New Fork Unit 13-2A well located in the SWSW of Section 2-T31N-R109W.

| Party | *Before Payout of the NFU 13-2A well | *After Payout of the NFU 13-2A well |
|---|---|---|
| McMurry Energy Company | 44.05000% | 34.77375% |
| Nerd Energy, Inc. | 22.02750% | 17.386875% |
| Fort Collins Consolidated Royalties, Inc. | 21.13750% | 16.684375% |
| Williams Production Rocky Mountain Company | 1.78000% | 1.405000% |
| ST Oil Company | 2.75000% | 2.75000% |
| III Exploration Company | 8.25000% | 8.25000% |
| Ultra Resources, Inc.* | 0.00000% | 15.937500% |
| Lance Oil & Gas Company, Inc.* | 0.00000% | 2.812500% |
| Total | 100.00000% | 100.000000% |

*assuming election to convert to payout and subject to the option provided under Article 9(c) as provided in that certain July 16, 1996 Farmout Agreement between Meridian Oil Company and McMurry Oil Company and further subject to the terms of said agreement.

2. Below 200 feet below the stratigraphic equivalent of 11,877 feet being total depth in the New Fork Unit 13-2A well located in the SWSW of Section 2-T31N-R109W.

| Party | Interest |
|---|---|
| McMurry Energy Company | 6.93000% |
| Nerd Energy, Inc. | 3.46500% |
| Fort Collins Consolidated Royalties, Inc. | 3.32500% |
| Williams Production Rocky Mountain Company | .28000% |
| ST Oil Company** | 2.75000%** |
| III Exploration Company ** | 8.25000%** |
| Ultra Resources, Inc. | 63.75000% |
| Lance Oil & Gas Company, Inc. | 11.25000% |
| Total | 100.00000% |

**The interest of ST Oil Company and III Exploration is subject to a produce to earn requirement as provided in that certain Leasehold Exchange Agreement dated January 26, 1999, as amended, between ST Oil Company, et al and McMurry Oil Company, et al. If such interest is not productive as provided in said agreement, then these interests will be reallocated to McMurry Energy Company, Nerd Energy, Inc., Fort Collins Consolidated Royalties, Inc. and Williams Production Rocky Mountain Company.

   F.   Township 31 North, Range 109 West, 6th P.M.
        Section 3: Lots 1, 2, S/2NE, SW

1. Surface down to 200 feet below the stratigraphic equivalent of 11,877 feet being total depth in the New Fork Unit 13-2A well located in the SWSW of Section 2-T31N-R109W.

3

| Party | Interest |
|---|---|
| McMurry Energy Company | 34.77375% |
| Nerd Energy, Inc. | 17.386875% |
| Fort Collins Consolidated Royalties, Inc. | 16.684375% |
| Williams Production Rocky Mountain Company | 1.405000% |
| ST Oil Company | 2.75000% |
| III Exploration Company | 8.25000% |
| Ultra Resources, Inc. | 15.937500% |
| Lance Oil & Gas Company, Inc. | 2.812500% |
| Total | 100.000000% |

2. Below 200 feet below the stratigraphic equivalent of 11,877 feet being total depth in the New Fork Unit 13-2A well located in the SWSW of Section 2-T31N-R109W.

| Party | Interest |
|---|---|
| McMurry Energy Company | 6.93000% |
| Nerd Energy, Inc. | 3.46500% |
| Fort Collins Consolidated Royalties, Inc. | 3.32500 % |
| Williams Production Rocky Mountain  Company | .28000% |
| ST Oil Company ** | 2.75000%** |
| III Exploration Company ** | 8.25000%** |
| Ultra Resources, Inc. | 63.75000% |
| Lance Oil & Gas Company, Inc. | 11.25000% |
| Total | 100.00000% |

**The interest of ST Oil Company and III Exploration is subject to a produce to earn requirement as provided in that certain Leasehold Exchange Agreement dated January 26, 1999, as amended, between ST Oil Company, etal and McMurry Oil Company, et al. If such interest is not productive as provided in said agreement, then these interests will be reallocated to McMurry Energy Company, Nerd Energy, Inc., Fort Collins Consolidated Royalties, Inc. and Williams Production Rocky Mountain Company.

4.   OIL AND GAS LEASES

See attached Exhibit A-1 for a description of the oil and gas leases covering the contract lands.

5.   ADDRESSES OF THE PARTIES

Ultra Resources, Inc.
304 Inverness Way South
Suite 295
Englewood, CO 80112
Attn: Robin Benko
Phone: (303) 708-9740
Fax: 303-708-9748

Lance Oil & Gas Company, Inc.
12200 N. Pecos Street
Denver, Colorado 80234
Attn: Land Manager
Phone: (303) 452-5603
Fax: 303-252-8520

McMurry Energy Company
370 17th Street Suite 3020
Denver, Colorado 80202
Attn:  Land Manager
Phone:   (303) 623-2885
Fax:    (303) 685-4611

4

Nerd Energy, Inc.
P.O. Box 3003
Casper, Wyoming 82602
Attn:  Cary Brus
Phone:  (307) 237-6796
Fax:     (307) 259-6301


Fort Collins Consolidated Royalties, Inc.
c/o AEC Oil & Gas (USA) Inc.
950 17th Street
Suite 2600
Denver, Colorado  80202
Attn:    Mike Murray
Phone:    (303) 623-2300
Fax:        (303) 623-2400


Williams Production Rocky Mountain Company
P.O. Box 3102
Tulsa Oklahoma  74101
Attn:   Chuck Barlow
Phone:   (918) 573-5298
Fax:        (918) 573-1324


ST Oil Company
1801 Broadway
Suite 600
Denver, Colorado 80202
Attn: Pam Reed
Phone: (303) 296-1908
Fax: (303) 296-0329


III Exploration Company
410 17th Street
Suite 1230
Denver, Colorado 80202
Attn: Phillip Shepardson
Phone: (303) 623-5995
Fax: (303) 623-5994

Exhibit "A-1"
Oil and Gas Leases
Attached to and made a part of that certain Operating Agreement dated October 25, 2001 by and between McMurry Energy Company, as Operator and Ultra Resources, Inc., et al , as Non-Operator(s).

| Lease No. | Lessor | Lessee | Legal Description | Recording Data Book | Page | Overriding Royalty Interests |
|---|---|---|---|---|---|---|
| WYY-051-00017-00 | WYYW-06269 | Donald B. Anderson | Township 31 North, Range 109 West, 6th P.M. Section 13: NE, SW Section 14: NE | 12 | 113 | 2% |
| WYY-051-00018-00 | WYYW-06270 | Donald B. Anderson | Township 31 North, Range 109 West, 6th P.M. Section 2: SW Section 3: Lots 1,2, S/2NE, SW | 12 | 106 | 2% |

End of Exhibit "A-1"

1 of 1

IN THE DISTRICT COURT OF SUBLETTE COUNTY, WYOMING

NINTH JUDICIAL DISTRICT

| | | |
|---|---|---|
| MCMURRY ENERGY COMPANY, a Wyoming Corporation, et al., | ) ) ) | Civil Action No. 6173 |
| Plaintiffs, | ) ) | |
| vs. | ) ) | ORDER CONCERNING MOTION TO ENFORCE SETTLEMENT AGREEMENT |
| ULTRA RESOURCES, INC., et al., | ) ) | |
| Defendants. | ) | |

Defendant Ultra Resources, Inc. having filed a Motion to Enforce Settlement Agreement and having requested an expedited hearing thereon, and the matter having come before the Court for a hearing on May 21, 2002, in the Teton County Courthouse, Jackson, Wyoming, and the parties appearing by their respective counsel, and the Court having heard the argument of counsel and having considered the documents filed in conjunction with the motion, and the Court being otherwise fully advised in the premises;

THE COURT FINDS:

1. In November, 2001, the parties to this suit executed a Mutual Release and Settlement Agreement which, among other things, purported to resolve a dispute over which company would serve as Operator of the Farmout Lands and the Non-Farmout Lands, which lands are described in the 1996 Farmout Agreement and the two Joint Operating Agreements executed at the same time as the Mutual Release.

2. Notwithstanding the execution of the settlement document and the two Joint Operating Agreements, a dispute has arisen as to which company is to serve as the operator of a well to be drilled in the NE1/4 of Section 14 of the contract area.

3. Shell Rocky Mountain Production, LLC, is the successor in interest to McMurry Energy, an original plaintiff herein, and Shell has given notice of its intent to drill a well in the disputed area with a bottom-hole location of 12,500 feet, which is well below the 9,931 depth limit of the Farmout Area in which the well is proposed.

*McMurray v. Ultra, et al.*
*Civil Action No. 6173*
*ORDER CONCERNING MOTION TO ENFORCE SETTLEMENT AGREEMENT*
*Page 1 of 3*

ATTACHMENT
4

4. The Settlement Agreement of November, 2001 and one of the Joint Operating Agreements of that date provide that McMurry Energy (now Shell) "shall be the Operator of all wells drilled on a surface location on the Farmout Lands to all depths, under the Joint Operating Agreements ("JOAs") that have been concurrently signed by the parties hereto..." except as provided in Sections 3.4 and 4.1 of the Settlement Agreement. The Settlement Agreement also provides that "The Farmout Lands are subject to depth restrictions as set forth in the Farmout Agreement and in the Joint Operating Agreements ('JOS's') executed contemporaneously herewith..." Para 3.2.

5. Section 3.4 of the Settlement Agreement provides "...notwithstanding any provision herein to the contrary, MEC will be the Operator of all wells which are legally permitted to produce hydrocarbons from a bottom-hole location on Farmout Lands (as defined herein)... and ULTRA will be the Operator of all wells which are legally permitted to produce hydrocarbons from a bottom-hole location on Non-Farmout Lands (as defined herein)..."

6. Other than providing surface acreage descriptions of the Farmout Lands and the Non-Farmout Lands, the Settlement Agreement does not further define those terms.

7. The Joint Operating Agreement dated October 25, 2001, which names McMurry Energy the Operator of the Farmout Lands, describes the surface acreage of the Farmout Lands (including the disputed well site herein). The JOA provides that depth restrictions, if any, shall be included in Exhibit A thereto. The depth restriction language in Exhibit A reads in its entirety: "this agreement covers all depths, however the interests of the parties as shown in Paragraph 3 below varies as to the depths shown."

8. There is a conflict between the provisions of the Settlement Agreement and the JOA. Under the terms of the Settlement Agreement, ULTRA should be the Operator of wells drilled in the Farmout Lands to a bottom-hole location below 9,931 feet (as is the case with the well proposed in this dispute). On the other hand the JOA says that McMurry Energy is the Operator on the Farmout Lands, and while the agreement describes the various interests of the parties to the agreement at various depths, the JOA says it "covers all depths."

9. Because of the conflict between the language of the two contracts involved in this dispute, there is an ambiguity which the Court cannot resolve with the evidence before it at this time.

IT IS ORDERED that the Motion to Enforce Settlement Agreement filed by defendant Ultra Resources, Inc. is denied because of the conflict with the provisions of the Joint Operating Agreement.

DATED the 21ˢᵗ day of May, 2002.

D. Terry Rogers
District Judge